1                    UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF KANSAS
2

3    UNITED STATES OF AMERICA,        Docket No. 16-20032-JAR

4          Plaintiff,                 Kansas City, Kansas
                                       Date:  08/16/2016
5    v.

6    LORENZO BLACK,
     KARL CARTER,
7    ANTHON AIONO,
     ALICIA TACKETT,
8    CATHERINE ROWLETTE,
     DAVID BISHOP,
9
           Defendants.
10   . . . . . . . . . . . . . . . . . . . .

11
                          TRANSCRIPT OF
12                       MOTIONS HEARING
            BEFORE THE HONORABLE JULIE A. ROBINSON
13               UNITED STATES DISTRICT JUDGE

14   APPEARANCES:
     For the Government:  Ms. Debra L. Barnett
15                         Ms. Annette Gurney
                           United States Attorney's Office
16                         301 North Main Street
                           Suite 1200
17                         Wichita, Kansas 67202-4812

18   For the Defendant Lorenzo Black:
                           Mr. John Jenab
19                         Jenab Law Firm, P.A.
                           110 South Cherry Street
20                         Suite 103
                           Olathe, Kansas 66061
21
     For the Defendant Karl Carter:
22                         Mr. David J. Guastello
                           The Guastello Law Firm, LLC
23                         4010 Washington Street
                           Suite 501
24                         Kansas City, Missouri 64111

25   (Appearances continued on next page).

```
 1   APPEARANCES:

 2   For the Defendant Anthon Aiono:
                         Mr. Jason P. Hoffman
 3                       Hoffman & Hoffman
                         CoreFirst Bank & Trust Building
 4                       100 East Ninth Street
                         Third Floor East
 5                       Topeka, Kansas 66612

 6   For the Defendant Alicia Tackett:
                         Ms. Kathleen A. Ambrosio
 7                       Ambrosio & Ambrosio, Chartered
                         800 Southwest Jackson
 8                       Suite 817
                         Topeka, Kansas 66612
 9
     For the Defendant Catherine Rowlette:
10                       Mr. Michael M. Jackson
                         Attorney at Law
11                       727 South Kansas Avenue
                         Suite 2
12                       Topeka, Kansas 66603

13   For the Defendant David Bishop:
                         Ms. Cynthia Dodge
14                       Cynthia M. Dodge, LLC
                         233 Southwest Greenwich Drive
15                       Suite 10
                         Lee's Summit, Missouri 64082
16
     For the Movant Federal Public Defender:
17                       Ms. Melody Brannon
                         Mr. Kirk C. Redmond
18                       117 Southwest Sixth Street
                         Suite 200
19                       Topeka, Kansas 66603

20   For the Interested Party David Lougee:
                         Mr. Jonathan L. Laurans
21                       Attorney at Law
                         1609 West 92nd Street
22                       Kansas City, Missouri 64114

23   Court Reporter:     Kelli Stewart, RPR, CRR, RMR
                         Official Court Reporter
24                       259 U.S. Courthouse
                         500 State Avenue
25                       Kansas City, Kansas 66101
```

1                          I N D E X

2

3

4                        E X H I B I T S

5    Court
     Exhibits              Offered              Received
6
              1                  10                   10
7
     Defendant's
8    Exhibits              Offered              Received

9           449                  14                   14

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  (1:38 p.m., proceedings commenced).

 2                  THE COURT:  All right.  You can be seated.

 3     All right.  We're here in United States versus Lorenzo

 4     Black, et al., 16-20032.  Your appearances, please.

 5                  MS. BARNETT:  Debra Barnett, Assistant

 6     United States Attorney, appearing on behalf of the

 7     United States of America.

 8                  MR. JENAB:  Your Honor, Lorenzo Black is

 9     present in person with counsel, John Jenab.

10                  MR. GAUSTELLO:  Karl Carter in person and in

11     custody with counsel, David Guastello.

12                  MR. HOFFMAN:  Mr. Aiono appears not but

13     through counsel Jason Hoffman, Your Honor.

14                  MR. JACKSON:  Catherine Rowlette appears in

15     person and by counsel, Mike Jackson.

16                  MS. DODGE:  Cynthia Dodge on behalf of David

17     Bishop, who appears in person.

18                  MS. AMBROSIO:  Your Honor, Ms. Tackett does

19     not appear but appears by counsel, Kathleen Ambrosio.

20                  MS. BRANNON:  Your Honor, the Federal Public

21     Defender appears by Melody Brannon and Kirk Redmond.

22                  THE COURT:  All right.

23                  MR. LAURANS:  Judge?

24                  THE COURT:  Yes.

25                  MR. LAURANS:  Interested party David Lougee
```

1    appears by Jonathan Laurans, but he's not present.  He's

2    detained, but not present.

3              THE COURT:  Lougee?

4              MR. LAURANS:  Lougee, L-O-U-G-E-E.

5              THE COURT:  All right.  All right.  Of

6    course, we were here last week on August 9th to hear on

7    an emergency basis the Rule 41(g) motion filed by the

8    Federal Public Defender's Office as intervenor and there

9    were a number of-- of you that joined in that motion.

10             I'd like to start just by making a record of

11   the motions to join and, just to clear up our docket, to

12   grant those motions.  So I think they are Motion 92

13   filed by Richard Dertinger, Motion 94 filed by David

14   Lougee, Motion 96 filed by Lorenzo Black, Motion 97

15   filed by Karl Carter, Motion 108 filed Alicia Tackett,

16   Motion 109 filed by Anthon Aiono, Motion 89 filed by

17   Catherine Rowlette, Motion 96 and 99-- no, I'm sorry,

18   Motion 96 filed by Lorenzo Black, Motion 99 filed by

19   David Bishop.

20             I think that's all of them.  Those motions

21   will be granted.  They're simply motions to join or

22   motions to preserve objection or related to the motion

23   that was filed by-- and the amended motion filed by the

24   Federal Public Defender.

25             So a number of things to take up today.  I

1    have not obviously fully ruled on the amended motion for

2    Rule 41(g) relief filed by the Federal Public Defender.

3    That's Document 85.  Nor have I ruled-- it's actually a

4    newly-filed motion that's Document 105 filed by the FPD

5    as a motion for Court to impound additional government

6    evidence.  That was just filed yesterday I believe, so

7    the government hasn't had an opportunity to respond to

8    that one.

9            Also, in Document 105, the FPD and defense

10    asked for appointment of a special master.  That is a

11    request that was made before that I do think the

12    government has responded to in its-- in its response,

13    which I'm trying to find, because the government filed

14    an omnibus response, although I don't think it was a

15    complete response to everything yet.  Yes, it's

16    Document 110, United States' first response to motion

17    and amended motion for Rule 41(g) return of information

18    and numerous motions to join.

19            And I have granted those motions to join,

20    but I-- I understand the government's position at least

21    on some individuals in terms of, you know, raising

22    standing arguments, including the arguments with respect

23    to the public defender as well.  Nonetheless, without

24    deciding that issue, I think this issue is properly

25    before me in terms of the defendants in the Lorenzo

1    Black case, so I intend to proceed with the motions and

2    the relief sought, at least with respect to those

3    defendants and perhaps with respect to everyone

4    ultimately.

5          All right.  So I provided to you all an

6    e-mail that I received and an attached letter that I

7    received from United States Marshal Ron Miller.  I had

8    requested that he be in contact with CCA and the county

9    jails that house pretrial detainees in the District of

10   Kansas.  And Marshal Miller, through considerable effort

11   and with a sense of urgency, has been in communication

12   repeatedly with those facilitates, as well as with his

13   national office and CCA and others.  And in a letter

14   authored today sets forth the current status of the

15   detention centers that the marshals use in this state.

16          And essentially, they are in compliance with

17   the Court's order in the sense that they are no longer

18   video-recording attorney-client conference rooms, they

19   are not recording, audio-recording attorney-client

20   communications either through phone, face-to-face, or

21   video-conferencing.  They have confirmed with Marshal

22   Miller that they are not going to do this, that they

23   understand the problems with this, they intend to comply

24   with the Court's order.

25          There was one facility that indicated some

1   reluctance to follow the Court's order and the Marshals

2   Service has removed the five persons that were housed

3   there from that county jail and is not going to put

4   anyone else in that county jail.

5           I don't have copies, but Marshal Miller has

6   written compliance verification from all Kansas county

7   detention facilities that they are in compliance and/or

8   have amended practices to ensure compliance.  CCA has

9   taken out all of the cameras in the six recording

10  rooms-- or the six conference rooms that they have them

11  in.  They've taken the video cameras out altogether.

12          Other jails that had-- of the eight jails in

13  Kansas that house our detainees, six of them weren't

14  recording at all.  But those that had cameras in the

15  rooms are shrouding the cameras, their plan is to shroud

16  the cameras with some sort of cloth cover so that while

17  there are attorney-client visits, those non-verbal

18  communications cannot be seen because they won't show up

19  on the camera.  And they're going to keep track of the

20  time and when they take it on and off and pursuant to

21  which visitations.

22          They've all assured that they will not allow

23  unmonitored attorney-client phone calls-- they will not

24  allow recording of attorney-client phone calls.  Most of

25  them have a system that allows the attorney, and I'm

 1  sure you all are aware of this, to provide their number

 2  or numbers that either their client will be calling them

 3  at or that the attorney will initiate a call from.  And

 4  the system allows those numbers to actually be input and

 5  blocked in the system so that when calls are made to or

 6  from those numbers, the systematically shuts off the

 7  camera.

 8              CCA is different in the sense that when an--

 9  a detainee places an outgoing call to their lawyer, that

10  call will be recorded unless the detainee tells CCA that

11  that's who they're calling, that they're calling an

12  attorney.  And if they tell them that, CCA turns off the

13  recording with respect to that particular phone for the

14  duration of that call.

15              So I've tried to summarize, you all have

16  what I've said and more in the letter from Marshal

17  Miller, and I wanted to make a record of that to start,

18  including-- Bonnie, if you will mark this as Court

19  Exhibit 1.  It's the original Marshal Miller's letter to

20  the Court that I provided to all of the counsel in the

21  Lorenzo Black case.  And I've also provided it to all of

22  the district and magistrate judges in the District of

23  Kansas so they're aware, because I know that some of

24  them have already had motions pertaining to these issues

25  filed in their-- in their cases.  So I'll admit Court

1  Exhibit 1 into the record.

2            And so there's a number of things that I'd

3  like to talk to you all today about, including the

4  appointment of a special master.  Before that, though,

5  I'd just be interested in hearing from you procedurally

6  about anything else that you think needs to be heard

7  today, other than the appointment of special master and

8  what the parameters of that might be.  Ms. Barnett.

9            MS. BARNETT:  Your Honor, I was hoping we'd

10  just take up the issue of the appointment of a special

11  master today.  With regard to the motions that have been

12  filed to impound evidence, and I-- I can't recall now,

13  but I think there was one other maybe yesterday, I would

14  ask for time to respond to those in writing.  And then

15  if we need to have another hearing, setting that on down

16  the road.  But otherwise, I'm prepared to talk about the

17  special master in terms of what we can agree to today,

18  but that would be about all I would want to address

19  today.

20            THE COURT:  All right.

21            MS. BARNETT:  Thank you.

22            THE COURT:  Ms. Brannon.

23            MS. BRANNON:  Your Honor, there were two

24  other things that we would like to bring to the Court's

25  attention outside of the special master, which I-- I

1    think the Court can fashion a procedure that would allow

2    the government to-- to respond in some way.

3         The first is we would like to add to the

4    record regarding the phone calls.  What has developed in

5    the last week is it is very clear that, in the past at

6    least, CCA recorded phone calls between attorneys and

7    clients.  And those recordings were provided to the

8    United States Attorney in this case.  We don't know how,

9    whether it was by a grand jury subpoena or other means,

10   we just know that they were turned over.  And that, in

11   turn, those phone calls have already been disseminated

12   to co-defendant counsel.

13        THE COURT:  In the Lorenzo Black case?

14        MS. BRANNON:  In the Lorenzo Black case.

15   I'm not sure about the other three that are interested

16   and have sentencing issues, I don't think that they've

17   got those, but I-- I think Mr. Redmond and Mr. Jackson

18   can address that more fully.

19        We provided the Court with a demonstrative

20   exhibit basically that sort of is a chart that lays out

21   some of-- some of this information.  So we'd at least

22   like to make a record on that today and understand that

23   the government may need time to respond.

24        The other matter is something that also came

25   to light in the last couple of days regarding Ms.

 1    Rokusek that relates very much to the statement that she

 2    made last week to the Court.  Because of the sensitive

 3    nature of that information, it's not something that we

 4    are prepared to present in open court.  I think Ms.

 5    Rokusek would probably ask the Court, too, to hear this

 6    in camera and ex parte.  But I will represent to the

 7    Court I think it bears very much on the Court's

 8    consideration of the special master and the scope of the

 9    special master.

10            But beyond that, what we have is essentially

11    we are ready to discuss the special master and-- and

12    those issues before the Court.

13            THE COURT:  So essentially you want to make

14    a record on the phone calls, and allowing obviously the

15    government time to respond.  But in that interim-- and

16    have you given Ms. Barnett a copy of this demonstrative

17    exhibit?

18            MS. BRANNON:  (Nods head up and down).

19            THE COURT:  I would like you or Mr. Redmond

20    to walk me through that.  But I assume what you're

21    asking for is a clawback order to get this material,

22    whatever it is, that's in the hands of the defense or

23    otherwise, back into someone's hands, whether it's the

24    government or into the Court's vault?

25            MS. BRANNON:  Exactly, Your Honor.  What

1    we're asking is for the government to identify what

2    copies they have, whether CCA still has originals of

3    those phone calls, and to whom it has been disseminated.

4    And to have those returned hopefully to the Court or

5    some other entity outside the U.S. Attorney's Office.

6            We would point out for the Court, and I know

7    Mr. Redmond can address this in more detail, that by

8    disseminating these attorney-client phone calls to other

9    defendant attorneys, that creates an ethical conundrum

10   for them because they have received what they believed

11   to be and what is, in fact, privileged, confidential

12   information between another attorney and their client.

13   They have that in their possession.

14           And how to proceed from this point, I think

15   we'll certainly be asking for guidance from the Court.

16   But by returning that-- being able to return that

17   information and take it out of their custody, I-- I

18   think that that would answer or remedy some of the

19   problem.  And Mr. Redmond could certainly address the

20   phone calls at this time if the Court wants to take that

21   up.

22           THE COURT:  All right.  Thank you.  Mr.

23   Redmond.

24           MR. REDMOND:  Thank you, Your Honor.  I

25   think maybe the easiest way to start is we would ask

 1    permission to mark this exhibit as Exhibit 449, just for

 2    record purposes.

 3              THE COURT:  It's a demonstrative exhibit

 4    that's a table pertaining to attorney-client phone

 5    calls?

 6              MR. REDMOND:  Yes, Your Honor.

 7              THE COURT:  All right.  Exhibit 449 admitted

 8    for demonstrative purposes.

 9              MR. REDMOND:  Your Honor, what this chart

10    depicts is not something of which I have personal

11    knowledge, because we obviously do not have the

12    discovery in the Black case.  What it is is some of the

13    attorneys who do have the discovery, they have 198

14    gigabytes of inmate phone calls.

15              THE COURT:  All right.  So these are

16    attorneys that aren't counsel of record in the Black

17    case?

18              MR. REDMOND:  That's correct, Your Honor.  A

19    number of them are here, but-- and I can't speak to why

20    those phone calls were provided in discovery.  But what

21    I can tell the Court is some of the defense counsel when

22    they opened the folder that's marked "CCA Phone Calls,"

23    what they're able to do is search those phone calls by

24    the attorney's telephone number.  I think people tried

25    to take care not to actually violate the privilege

 1    themselves.  And so I-- you know, we don't know what is

 2    discussed on these phone calls, we just know that there

 3    is a phone call between a client at CCA and an attorney

 4    who is listed in this chart that has been recorded and

 5    provided to the Lorenzo Black defendants in discovery.

 6              THE COURT:  Okay.  I-- again, I just need--

 7    want to be clear on this.  So 449 lists a number of

 8    attorneys and defendants who are defendants in other

 9    cases?

10              MR. REDMOND:  Yes, Your Honor.

11              THE COURT:  And the attorneys on-- and these

12    conversations you say have been audio-recorded at CCA,

13    only CCA, not other jails, just CCA?

14              MR. REDMOND:  I have no information about

15    other jails, yes, Your Honor.

16              THE COURT:  Okay.  All right.  But in any

17    event, they've been recorded.  And these particular

18    calls have been provided as part of the discovery in the

19    Black case?

20              MR. REDMOND:  That is what I'm told, yes.

21    Maybe just an example of one of the defendants.  The

22    client's name is Lamar Steele, Mr. Steele's attorney is

23    Chris Joseph.  We provided the case number for the Court

24    in the third column.  The fourth column lists the dates

25    between the first and the last recorded phone call, here

1   10-24 of 2014 to January 21st of 2015.  The fifth column

2   is the file location on the-- the disks that were

3   provided to the counsel in the-- in the Black

4   prosecution.  And the last column is the number of calls

5   that were recorded between that inmate's PIN number at

6   CCA and the attorney's telephone number, which in this

7   case is 43 calls.

8               THE COURT:  All right.  Anything more?

9               MR. REDMOND:  No, Your Honor.  Thank you.

10              THE COURT:  All right.  Ms. Barnett, can you

11  speak to this?  Are you prepared to speak to this?

12              MS. BARNETT:  No, Your Honor, I'm not.

13              THE COURT:  Well, Mr. Redmond, I don't know

14  if you can tell me more.  So the defendants in the

15  Lorenzo Black case have discovered a number of

16  audio-recordings on it looks like several disks, maybe

17  more than the ones listed on here.  And those

18  audio-recordings purported to be-- I mean, what they

19  thought they were discovering was conversations they

20  were having with their own clients?  I'm not

21  understanding what it is they thought they were

22  discovering.

23              MR. REDMOND:  Which is exactly what Ms.

24  Brannon just asked that I sort of supplement the record

25  on.  They did not-- I mean, like, for example, Mr.

1    Joseph did not receive these recordings.  The Lorenzo

2    Black counsel did.  He's only aware of them because the

3    counsel in Lorenzo Black notified him that we have

4    attorney-client phone calls-- presumably attorney-client

5    phone calls between CCA and your office and we're just

6    not going to listen to them.

7            And which is why-- I mean, this is our

8    concern in the litigation is that our phone calls, just

9    like our video-- video of our visitation is out there as

10   well, which is why we intervened under Rule 41(g).  I--

11   I wish I could be more helpful.  I'm certainly not in a

12   position to expand on the contents of the phone calls or

13   anything more about the mechanism by which they were--

14   or the reasons that they were provided in discovery.  I

15   just don't know.  I just know that counsel in this case

16   are receiving discovery that certainly appears to be

17   subject to the privilege.

18            THE COURT:  Well, counsel in this case that

19   are receiving this, are they receiving this mixed in

20   with other discovery that they think is appropriately

21   received by them?

22            MR. REDMOND:  I think so, Your Honor, the--

23   but I'm not certain.  Traditionally, just from--

24   speaking from my experience, I will get dumps of phone

25   calls from clients.  And typically what I think the

1  government is looking for is inculpatory statements made

2  in a non-privileged fashion to attempt to use against my

3  client.  But here, apparently those weren't filtered

4  out.  It looks-- presumably, it looks like that's the

5  case.  And so I think that there's a number of

6  non-privileged phone calls just based on my experience,

7  not based on my knowledge of the discovery, and those--

8  those were not segregated out from the privileged phone

9  calls.

10        THE COURT:  All right.  Are there-- is there

11  anyone on behalf of one of the defendants in the Lorenzo

12  Black case that wants to provide any further explanation

13  of what you received and how you discovered this?

14        MR. JACKSON:  Yes, Your Honor.  Mike Jackson

15  on behalf of Cathy Rowlette.  Let's see, the easiest way

16  to explain this is there was a directory or a folder

17  contained in the hard drive that we received from the

18  government.  And the name of that directory was "CCA

19  Calls."  The subdirectories within that consisted of 39

20  inmates at CCA.

21        And then so you would pick an inmate, such

22  as Richard Dertinger, which is the top one.  And you

23  would then have access to MP3 files.  And there was an

24  index below them that would take you right to Securus

25  through the Internet.  And that would list all of the

1    phone calls that Mr. Dertinger had made in-- while he

2    was incarcerated at CCA.

3            Okay.  Now, I knew that he was represented

4    by Jackie Rokusek.  So I used her-- the last four digits

5    of her phone number and did a search within that index

6    limited to Dertinger.  And sure enough, I came up with

7    her phone number.  And it was an audio file and I

8    started it and immediately figured out that it was

9    covered by the attorney-client privilege.

10           I did the same thing with a Mr. Webb, Virok

11   Webb, who had real serious charges against him in this

12   court, and I believe you were the judge.  And I was able

13   to find Mr. Virok calling Rokusek 11 times.  And they

14   were all privileged communications owned only by the

15   client.

16           And so in the time I worked on it, I found

17   nine, nine inmates who had called their attorney who

18   that recording turned up in the hard drive disk - which

19   I have in my office right now, and the other five

20   defendants have at their office - in discovery in Black.

21           And as Kirk said, there's 198 gigs in that

22   CCA file.  And so that I'm sure there's many more

23   instances of this than the 74 I was able to find in a

24   few hours.

25           But that "CCA Calls" is part of that hard

1    drive.  So there's a lot of other information on there.

2    And I'm particularly concerned that this is now-- this

3    is in the custody of Securus, who keeps that

4    information.  When you get it, you access Securus by the

5    Internet.  And so this disclosure or publication by the

6    government has now expanded internationally.

7            THE COURT:  I'm not understanding that

8    argument.

9            Mr. JACKSON:  All right.  Securus is the

10   company that handles all phone calls from CCA.  Securus

11   bills the inmate for these calls.  I received MPG files

12   which are audio files, like music, but below that there

13   was an index.  And if you hit the index, you then point

14   your database at the Securus database that's in the

15   Cloud.  It's off-- offsite.  And that will then give you

16   a lot more information about the date and the identity

17   and the number.

18           So when I say, well, it went international,

19   that's because it's on Securus' database organized

20   according to each defendant's PIN number.  And, you

21   know, it would be subject to-- somebody could get at

22   what attorney-client privilege is meant to protect.  Did

23   that come-- did you understand where I was going?

24           THE COURT:  Yeah, I understand what you're

25   saying.  I guess it depends on how Securus-- well, I

1  don't know.  I mean, it depends on how they preserve it

2  and-- and how it is that you were able to access it.

3  You didn't have-- it wasn't encrypted, it wasn't-- you

4  didn't have to use a password, that you clicked on a

5  link provided to you by an index that was provided by

6  the U.S. Attorney's Office and were able to access your

7  own client's calls, but also able to access other

8  attorney-client calls.

9          MR. JACKSON:  39 of them.  Now, I couldn't

10  get my client's calls because she has not been in CCA.

11  And when you hit the index, it just took you to that

12  particular inmate's file, but the file--

13          THE COURT:  So in 39 inmates that are listed

14  in the subdirectory, those 39 inmates include-- do they

15  include the-- the defendants in this case, in the

16  Lorenzo Black case that are in custody, plus others?

17          MR. JACKSON:  That's correct.  They include

18  Steve Rowlette, who initially was a part of this case

19  and been removed, and then they also include Mr. Karl

20  Carter.

21          THE COURT:  All right.  So did anyone-- did

22  the prosecutors represent to you why they were providing

23  you with calls for other inmates as part of the

24  discovery?

25          MR. JACKSON:  No.  No, they didn't consult

1    us as far as I know, but--

2            THE COURT:  I mean, did you ask?  Did any of

3    you ask, "Why am I getting calls from 39 inmates?  Why

4    am I not just getting my own client's calls?"

5            MR. JACKSON:  No.  I didn't ask.

6            THE COURT:  But some of these calls are not

7    privileged in the sense that they're a detainee that's

8    calling somebody else.

9            MR. JACKSON:  Oh, a majority.  Like in--

10   there would be 1,000 calls, and four of them would be to

11   the attorney.  The rest would be, you know, to family

12   members or whatever.  And that was all in one-- well,

13   let's just call it all in one file.

14           THE COURT:  All right.  So presumably, and

15   I-- I don't know if Ms. Barnett can answer this, but you

16   thought what you were discovering were non-privileged

17   phone calls of your-- of the defendants in this case and

18   perhaps others that may or may not be unindicted

19   co-conspirators, something like that?

20           MR. JACKSON:  Exactly.  I was looking for

21   what exculpable evidence I could find.  And then all of

22   a sudden it became apparent that there was privileged

23   communications being published.

24           THE COURT:  All right.  I understand.

25           MR. JACKSON:  And I created this

1    spreadsheet, and so I stand by what's in it, Judge.

2                THE COURT:  Okay.  Thank you.

3                MR. JACKSON:  Thank you.

4                THE COURT:  All right.  And again, Ms.

5    Barnett, do you have any knowledge about the audio

6    calls?

7                MS. BARNETT:  With regard to the specific

8    ones that we're talking about in the demonstrative

9    spreadsheet, no, Your Honor, I don't.  I do know from

10   talking to the people at CCA and their attorney earlier,

11   that in the intake process when an inmate goes into CCA,

12   that they actually will give them the opportunity to

13   tell them - if they have an attorney - the attorney's

14   phone number, so that that can be put into their system.

15   And somehow, and I'm not electronically bright, but

16   somehow then that allows that phone call to be exempted

17   from the recording system.  I think that's even kind of

18   mentioned in Marshal Miller's letter to the Court that

19   you previously discussed.

20               So I don't know whether these particular

21   inmates designated these attorneys, before or during or

22   after these calls were made, as their attorneys so they

23   wanted their calls exempted from recording or not.  That

24   would be something that I could certainly look into, if

25   the Court would give me time.

 1              But I would just suggest to the Court that

 2    there are circumstances under which calls between

 3    inmates and their attorneys are not confidential,

 4    attorney-client privileged phone calls.  And I don't

 5    know whether that applies to this situation, but

 6    certainly in situations where at the beginning of the

 7    call people are forewarned, "Your call is being

 8    monitored, it's being recorded," and they go ahead and

 9    talk, there is the argument, and I would advance that

10    argument, that they've waived any privilege that they

11    have if they then continue to speak with their attorney

12    and talk about otherwise confidential matters.

13              So that's why I would like additional time

14    to not only brief-- file a brief with the Court and

15    respond to the defendant's motion that was filed

16    yesterday, but I can, if the Court would like, go ahead

17    and look at these specific instances.  I don't want to

18    listen to the calls, but find out the circumstances

19    surrounding each of these clients' phone calls, when

20    they were made, and what they conveyed to CCA as far as

21    whether they had representation and they wanted their

22    calls exempted.

23              THE COURT:  All right.  Are you-- similar to

24    agreeing to surrender the video-recordings until we can

25    sort all this out, do you oppose a clawback order to

1  gather all these audio-recordings?  Because it sounds

2  like if there's a mix of non-privileged and privileged

3  calls, and it could be that you take the position that a

4  call is not privileged, even though it's between an

5  attorney and client for some reason, I mean, that's

6  something that would have to be handled through a

7  privilege log and litigation and perhaps a special

8  master figuring that out.  But in the meantime, it makes

9  sense to me that, similar to the video-recordings, we

10  need to claw back everything from everywhere until we

11  can figure it out.  Would you agree?

12          MS. BARNETT:  Yes.

13          THE COURT:  All right.  So in terms-- and,

14  well, I was going to start asking this about the video

15  as well, but we'll need to know where it is, who has it,

16  and-- and then, you know, how to go about getting it all

17  back and into the Court's custody pending further order.

18          MS. BARNETT:  All right.

19          THE COURT:  Okay.

20          MS. BARNETT:  Thank you.

21          THE COURT:  All right.  Ms.-- yes.

22          MS. BARNETT:  May I have just a moment,

23  please, Your Honor?

24          THE COURT:  Sure.

25          (Counsel confer).

1          THE COURT:  And we can take a break if you

2    want-- if you all want to confer, that's fine.  Would it

3    be helpful to take a break?

4          MS. BRANNON:  Your Honor, I think we have

5    resolved it.  There were some outstanding videos at CCA,

6    I think those are being taken care of.  Well--

7          MS. BARNETT:  When I had met with the warden

8    last week and spoke to her, she had indicated that they

9    had DVRs that were continuing to collect video feed

10   recordings from the various cameras out there.  She

11   asked about whether or not they needed to hang on to

12   those for us.

13         In checking further into that, what I

14   learned from speaking to their attorney, who understands

15   the issue and the Court's order and everything, she told

16   me that when the original DVRs that the Court has were

17   pulled from their system, six other DVRs were put into

18   CCA's system back in May.  And they have continued to

19   run and record on everything out there except the

20   attorney rooms until last week when they stopped

21   recording the attorney rooms.

22         These DVRs will record, and I'm just going

23   to give a guesstimate, for about 90 days and then they

24   overwrite or record over the old stuff.  And they-- they

25   just are kind of circular in that way in the way they

 1  record.

 2               So what the attorney has told me is, is that

 3  these-- the second set of DVRs that went in in May,

 4  that's all there is.  Those DVRs.  No copies of those

 5  have been produced for us since May.  We haven't been

 6  given access to those DVRs to make copies.  Nobody has

 7  made copies for us.  And I told her that we're not

 8  asking you to make copies for us.

 9               So there are no extra copies out there

10  floating around.  It's just the DVRs that are out there

11  right now in their system that are recording their

12  camera feeds on everything except the attorney rooms.

13  Does that make sense?

14               THE COURT:  All right.  So this is

15  post-subpoena--

16               MS. BARNETT:  Yes.

17               THE COURT:  -- DVRs, it includes both

18  attorney rooms and everything else in the facility?

19               MS. BARNETT:  Up until last week when the

20  Court ordered them to stop recording in the attorney

21  rooms.

22               THE COURT:  Attorney rooms, okay.  So can

23  they segregate the attorney room camera recordings?  I

24  mean, because obviously my order didn't go to the

25  facility-wide recordings, only the attorney rooms.

 1              MS. BARNETT:  I don't know if they can or

 2    not.  I'm not sure, again, how these DVRs actually work.

 3    But I know that they're-- I know they're not making

 4    recordings of those-- that video for anybody, it's just

 5    now-- it will be rewriting over that if that-- I'm not

 6    sure I'm explaining that very well, but--

 7              THE COURT:  And I'm not-- I don't-- well, I

 8    think it's beyond the purview of the order to ask that

 9    they turn over-- I know right now you-- you all

10    subpoenaed or the grand jury subpoenaed, or whoever, the

11    universe of recordings for obvious reasons.  I mean,

12    they have perhaps evidentiary value in the CCA case.

13    But there's no reason-- well, you didn't subpoena the

14    universe of recordings after that particular grand jury

15    subpoena that issued in April, so you're not entitled to

16    it.

17              MS. BARNETT:  Correct.

18              THE COURT:  But there's-- then but with

19    respect to the subset of attorney-client, we've got an

20    issue similar to what we had with those you took

21    possession of, because at least for now they exist.

22    They may ultimately be recorded over, but for now they

23    exist on some DVR server or whatever.  Correct?

24              MS. BARNETT:  Correct.

25              THE COURT:  Okay.  What-- so what have you

1   all discussed about this?

2          MS. BRANNON:  Well, Your Honor, part of it

3   is we were just trying to sort out what is actually

4   there.  It's our position that-- that I believe that CCA

5   could do the same thing.  They could pull those DVRs,

6   provide those to the Court in order to preserve it.  And

7   certainly-- you know, for this limited purpose, I think

8   they could pull that sixth DVR that has the

9   attorney-client visitation and give it to the Court.

10          Another alternative is that if the Court

11  would order CCA not to produce those to a third party

12  and order the U.S. Attorney's Office in Kansas not to

13  subpoena or request those recordings in any way.  So

14  there-- there are a couple of ways I think to protect it

15  if it's being recorded over.  But the cleanest way would

16  just have-- be to have CCA pull those and provide them

17  to the Court.

18          THE COURT:  All right.  Ms. Barnett, do you

19  have a position on which alternative?

20          MS. BARNETT:  Well, with regard to the order

21  that we not be allowed to issue a subpoena for or

22  request copies of what's on their DVRs, if the Court is

23  inclined to do that, I don't object to the Court saying

24  that with regard to the footage from the attorney rooms.

25  But I do think that we have the right to subpoena or

1  obtain a court order to get video footage and recordings

2  from the other locations that cameras are at out at CCA,

3  as long as they are not in the attorney rooms.  And

4  we're asking-- we would not ask for that type of a

5  visitation recording.

6            THE COURT:  All right.  So I think probably

7  the cleanest way to do this is for me to issue an order

8  that orders CCA to provide recordings only from the

9  attorney-client rooms that span the time period from

10  when they responded to the last subpoena until the day

11  they cut off the cameras, which was yesterday or last

12  week or something.  So I'll issue an order to CCA to

13  that effect.  Hopefully, again, they're just segregated

14  on one or two drives.

15            Okay.  All right.  Anything else before we

16  talk about special master?

17            MS. BARNETT:  No, Your Honor.

18            THE COURT:  Okay.  So-- and as I understand

19  it, you want the record to include an in camera-- my in

20  camera hearing of additional information from Ms.

21  Rokusek; is that correct?

22            MS. BRANNON:  That's correct.  It would sort

23  of be a continuation of her statement from the last

24  hearing with new information.

25            THE COURT:  All right.  I think what we'll

 1    do is we'll go through everything we're going to do.

 2    We'll do that last, and I'll ask you all to stick around

 3    outside of the courtroom in the event I determine that

 4    something that she's telling me in camera is better

 5    taken up with-- with you all in your hearing.  I'll

 6    discuss that with Ms. Rokusek, make a record of it, and

 7    then bring you back at the end of the hearing for that.

 8    But we'll-- we'll do that at the end of this hearing, at

 9    least hearing from Ms. Rokusek.

10          So let's talk about the special master.  So

11    a lot of issues here, but from what I gather from what

12    you all have filed, you don't agree on the scope and the

13    duties of the special master, except that it sounds like

14    you do agree that the special master should go through I

15    would guess the two drives for sure, maybe sample the

16    other drives, and ascertain-- first of all, ascertain

17    that there's-- whether or not there's privileged

18    material on them, and secondly, ascertain how to go

19    about segregating out non-discoverable, privileged

20    information from privileged information, if-- if there's

21    any divide to be made.

22          So, for example, on the one drive, as I

23    understood it from the last hearing, that was only

24    attorney-client rooms.  So presumably, everything on

25    those recordings on that particular drive, the sixth

1   drive I think, would be privileged and maybe there's no

2   slicing and dicing to do.  But there was another one

3   that was sort of a mix, at least that's the way the

4   index looked, something that a special master would need

5   to figure out.  Would you agree?

6           MS. BARNETT:  Actually, I-- sorry, Your

7   Honor.  Actually, I think on the index on DVR 6, there

8   were a number of other camera angles that were reflected

9   on the index that might not be privileged.  And quite

10  frankly, we're not necessarily agreeing that every

11  contact in one of those rooms, however it's recorded,

12  wouldn't be an attorney-client privileged conversation

13  or a meeting I guess that we're just looking at the

14  video on.

15          I think there's a possibility, and I haven't

16  looked at the video so I don't know how good it is, but

17  depending on the quality, where the camera is at, the

18  angle, whether or not you can zoom it or not zoom it, I

19  think there is a possibility that some of those

20  recordings may not be of a confidential communication or

21  confidential in nature.  And so we feel like with regard

22  to those, a special master needs to look at them

23  specifically, each session or each meeting, and make

24  that determination.

25          There may be also some interviews taking

1    place of inmates by people who are not their attorneys.

2    And so we would think that the special master might need

3    to know that and determine that as well.  But I don't

4    think that all of the camera angles captured on DVR 6

5    are of the attorney-client rooms.  I think there's other

6    images captured there that would not be privileged or

7    confidential.

8              THE COURT:  Well, I don't know if I said the

9    wrong exhibit number, but I thought there was one drive

10   where there was some sense that there was a mix and then

11   there was another drive that was only attorney-client

12   rooms.

13             MS. BARNETT:  DVR 5 has the one reference to

14   I think it's a "low attorney room," and I don't think

15   that that actually turns out to be a room where there

16   were confidential communications taking place, but I do

17   think the special master should look at that and make

18   that determination.  And it does list a lot of other

19   camera angles.

20             DVR 6 had quite a few different camera

21   angles that were listed on it.  And towards the middle

22   and the end, then it talked about a number of attorney

23   rooms that it had recordings from.

24             THE COURT:  So when you say the camera

25   angles, do you mean outside of the attorney-client

1   conference room?

2           MS. BARNETT:  Yes.

3           THE COURT:  So what you're telling me is you

4   think for DVR 5 and 6, a special master is going to need

5   to go through each of those?

6           MS. BARNETT:  Yes.

7           THE COURT:  And then what about the other 1

8   through 4?

9           MS. BARNETT:  I didn't-- and I don't think

10  Ms. Brannon had actually asked the Court to take those

11  into custody last week, but I believe Ms. Rokusek had

12  asked for those to be taken into custody.  I don't have

13  any reason to believe there's privileged material or

14  even arguably privileged material on those DVRs.  But I

15  think to put everyone's mind at rest, it would probably

16  be helpful if a special master could spot-check them

17  and-- and could probably do that fairly quickly.  And

18  then if there's a determination that there isn't

19  anything privileged on them, push those out so that they

20  can be then copied and provided to defense counsel.

21          THE COURT:  All right.  And beyond that,

22  what you've just described, the special master's review

23  of these spot-check of DVRs 1 through 4 and complete

24  check and sorting and I guess creation of a privileged

25  log on 5 and 6, is that the extent of what you want the

 1    special master to be ordered to do at this point?

 2              MS. BARNETT:  Yes.

 3              THE COURT:  All right.

 4              MS. BARNETT:  Thank you.

 5              THE COURT:  All right.  Ms. Brannon, I know

 6    that you want that plus, so let's talk about the plus.

 7              MS. BRANNON:  Well, a couple of things we

 8    would point out from Exhibit 439, which is a listing of

 9    all the camera recordings - although this isn't really

10    in the purview of our-- our challenge to the

11    attorney-client privilege - these videos include the

12    medical back hallway, medical female holding, the

13    nurse's station, a lot of things that might be protected

14    in other ways.  I would also point out it takes videos

15    of a number of hallways and tiers.  There are areas that

16    may be included in here that I-- that could well include

17    video of strip searches of our clients, which I think

18    they have a privacy interest in.

19              We would remind you that these are-- people

20    are pretrial detainees still entitled to the presumption

21    of innocence.  And they have not forfeited all of their

22    privacy rights, they're not convicted of anything.  And

23    to-- to look through these and see if there are things

24    like strip searches, if you can tell what medications

25    they are getting, if you know that they've gone to

1   medical and having certain procedures, I-- I think those

2   are concerns that perhaps a special master should look

3   into as well.

4           As far as the attorney rooms, the idea of a

5   special master going through all of those videos, first

6   of all, and trying to match the video up with the

7   attorney or the inmate, I mean, that's sort of clerical

8   work.  And I'm not sure that it can actually be done.  I

9   don't know that CCA actually records which attorney is

10  in which rooms.  You know, I know when I get there, they

11  have my name on the list, my name is on a chart.  But as

12  I'm going back, there's just a radio communication, you

13  know, "We put him in Room 6."  We don't know if that's

14  recorded.  I think there are a number of problems for a

15  special master in doing that.  There are a number of

16  problems, too, with a special master looking at this and

17  saying, yes, there is privileged information on this, or

18  no, there is not privileged information on this.

19          There are so many details about these cases

20  and so many nuances, a special master might not be able

21  to-- to identify that.  You know, a lawyer walking in

22  with a pile of trial notebooks to go through with a

23  client is different than a lawyer walking in with a plea

24  agreement, for example.  And that has significance, it

25  could have significance to a prosecutor, about whether

1   to go get a deal with a co-defendant because they're

2   going to trial, as opposed to this case is going to work

3   out.

4          I-- I-- the fact that the government is not

5   agreeing simply to abandon all of the videos of the

6   attorney-client rooms I don't understand.  Why would

7   they not at least make that remedial offer to the Court,

8   saying if it is a videotape of that room, we're not

9   going to bother with it at all.  Because if there is

10  nothing in that room that is privileged, if there's

11  nothing going on there, what possible value could it

12  have to them?  If it's a video of a defendant sitting

13  there alone because a lawyer didn't show up, what

14  possible value could it have to the government?  And why

15  would we have a special master spend time doing that

16  instead of just telling the government, "Give this up"?

17         To not even offer that and to want to go

18  through and-- and sort of parse out and try to identify

19  which defendant this is and whether anything happened in

20  that room, perhaps the Court wants-- wants the special

21  master to do that, and I'm-- you know, that might be a

22  minor point.  I just don't know that it's productive.  I

23  think--

24         THE COURT:  Well, to-- to the extent there's

25  a mix of privileged and non-privileged things on a

1    particular recording, you do think it is the role of a

2    special master, or perhaps somebody they hire at a lower

3    rate, to go through and say if-- and I-- frankly, I

4    don't even know if the system would allow for sort of a

5    slice and dice of the tape because it's driven by a

6    camera, it's not necessarily driven by time slots.  I

7    mean, that's going to have to be figured out.

8              But assuming there's a mix, you don't have a

9    problem with somebody going through and, if they can,

10   saying here's-- here's what is not privileged that the

11   government can have, and then disseminate, versus here's

12   what is privileged-- or at least here are the

13   attorney-client contacts.  You can tell it's an attorney

14   and a client or a psychologist and a client or a

15   polygrapher and a client, et cetera, and-- and those

16   need to be withheld.  You don't have a problem with that

17   sort of culling out and sorting process?

18             MS. BRANNON:  I don't, with the exception

19   that I think the attorney should be able to look at

20   those before there is a call made that this simply has

21   no attorney-client communication value.

22             THE COURT:  What attorney?

23             MS. BRANNON:  Whoever is identified on these

24   tapes.  If I have a meeting with a client on there that

25   is identified by the special master and the special

1    master has said, "I deem that there's no value to this,

2    an attorney-client privilege," I don't know that I'm

3    willing just to say we'll rely on that without knowing

4    exactly what is on that tape.  And perhaps if there

5    needs to be another level of-- of review, I don't know.

6            THE COURT:  But why would it matter?  I

7    mean, if the special master's recommendation is this was

8    a meeting between you and your client, the government

9    can't discover it, no one else can discover it, why does

10   it matter that you don't see it?  I mean, it's not-- it

11   doesn't have evidentiary value.  Even if it did, it was

12   privileged, no one is going to discover it.  So why

13   would we need another level of review for your benefit

14   at that point?

15           MS. BRANNON:  You know, if that's the line

16   that is given to the special master, that if an attorney

17   and client are in that room, it's deemed privileged, or

18   an attorney-- or a client and a psychologist are in that

19   room communicating with each other, I-- I think the rest

20   of it may not matter.

21           THE COURT:  Is there any-- is there any time

22   when in these attorney-client conference rooms a client

23   is going to be in there with another individual when it

24   wouldn't be privileged?  I mean, are they ever in there

25   where they're talking to the prosecutor or FBI agent or

1    someone other than a member of the defense team?

2         MS. BRANNON:  I remember one occasion where

3    I think there was a debriefing taking place at CCA.  I

4    don't think that happens.  And I don't know that it

5    happens in those rooms necessarily.  Clearly, doing that

6    creates a great danger to the client who's being

7    debriefed because it becomes so readily accessible.

8    That's the only thing I can think of.  I don't know that

9    that happens.  Surely if the government knows about the

10   debrief, they could pinpoint that for the special

11   master.  But it would be such a rare thing, I don't know

12   what in the world it would be.

13        The only other scenario would be a client

14   who is sitting in the room alone either waiting to be

15   picked up or a lawyer had to cancel and they had already

16   been brought down, so there may be that footage.  But I

17   can't imagine that there's any value in that to the

18   government, which-- I mean, it gets me back to the point

19   that it's either attorney-client privileged

20   communication or it's a client sitting in there by

21   himself or talking to a guard or whatever, that I can't

22   imagine has any value to the government.

23        And so again, the fact that they're not just

24   saying, "Take this, we don't want it, we acknowledge

25   that there-- that this video is problematic and

1    privileged and confidential," that seems a lot easier

2    way to go.  But, no, we-- we would not have any

3    objection to a special master sorting through that I

4    suppose.

5            THE COURT:  Do you have any idea how many

6    hours of video the DVR holds?  I know I've heard this

7    sort of-- it loops over, depending on how much is

8    recorded.  But I mean, what is the-- I guess the

9    magnitude of its memory or what's the potential?

10           I mean, when we start talking about hiring a

11   special master, I have to give them some idea of the

12   scope of review, if they have to go through DVR 5 and

13   sort and cull.  I mean, how many hours?  I mean

14   terabytes and gigabytes mean nothing.  How many hours

15   are we talking about?  Has anybody shared that with you?

16           MS. BRANNON:  No, Your Honor.  I'd probably

17   defer to Mr. Naseem and whether he could even look at

18   the information and-- and guess.  What I can tell the

19   judge, is based on the government's pleadings, they have

20   recordings from January through May.  I-- you know, we

21   probably see 15 clients at CCA a week.  Our office does.

22   So when you add in CJA and retained counsel and beyond

23   that, if we see them for, you know, 15 or 20 hours just

24   ours per week, multiplied by that time, and then you add

25   in the CJA counsel and retained counsel.

1           THE COURT:  Well, if we came at it a

2    different direction, and this would definitely

3    overstate, but if we assumed that, you know, in this

4    five-month time period there are however many hours a

5    week in which an attorney can use a room-- and I don't

6    know what CCA's hours are.  I mean, when you-- when you

7    go visit, what-- what are the hours you're limited to?

8    I know-- is it Monday through Friday or can you go up on

9    Saturdays and Sundays?

10           MS. BRANNON:  Generally it's Monday through

11   Friday, 8:00 to 4:00.  But we-- you know, if you call

12   ahead, we do routinely see clients on the weekends.

13           THE COURT:  And does CCA-- I assume they

14   keep a log of that?

15           MS. BRANNON:  Yes.

16           THE COURT:  Is that something that has been

17   part of the discovery, to your knowledge, in this case?

18           MS. BRANNON:  Yes.  I-- I also know that,

19   for example, when a client is in trial, CCA will make

20   accommodations for the attorney to visit in the evening

21   to accomplish trial preparation.  That, too, would be on

22   a-- a log.

23           THE COURT:  Okay.  And I'm unclear, I don't

24   remember, where are those logs?  Was that part of the

25   discovery?

1          MS. BRANNON:  I haven't seen the discovery.

2     It's my understanding that it is part of the discovery.

3     When we make an appointment with CCA, they have a

4     calendar up front where it's written out.  And then in

5     addition to that, there is a calendar that the officer

6     who's checking us in has that basically says this

7     attorney is here for this period of time to see this

8     client.  It does not, to my knowledge, correspond to a

9     particular room.

10          But there should be at least two, if not

11     three, records documenting who-- which lawyer is there

12     to see which client.  I don't know that it's always

13     accurate because, you know, our schedules change a lot.

14     And sometimes we get there and the client has been taken

15     to medical or something like that, but it would be--

16     certainly be a starting place.

17          THE COURT:  Okay.  To your knowledge, can

18     someone if-- assuming the logs are discovered, can

19     someone use those logs to - I mean, I think I heard Ms.

20     Rokusek speak to this last time - but identify a-- a

21     date and time that they visited a client or that someone

22     visited a client and then match that up with the video

23     by inputting the date and time?

24          MS. BRANNON:  Generally, I would think so.

25     The-- the issue would be, they would probably have to

1    look at all seven rooms and identify which room that

2    that attorney and client were in.

3         THE COURT:  And you say when you check in or

4    when you fill out a log or whatever, whoever they fill--

5    they fill the log out for you, it's not identified to a

6    specific attorney room, it's perhaps whatever room they

7    have available?

8         MS. BRANNON:  Right.  And sometimes we get

9    back there and they switch them around.  It's-- you

10   know, they work with what they have available and-- and

11   who needs to go in what room.  So it's rather fluid once

12   we get back there.  And I don't know that they saw a

13   reason to record which attorney was in which room, other

14   than knowing it at that time.

15        THE COURT:  Okay.  All right.  Anything

16   else?  We've talked about the video.  The audio,

17   obviously Ms. Barnett needs a chance to respond to, but

18   was there anything else you want to tell me about that

19   at this point?

20        MS. BRANNON:  Well, I don't know if the

21   Court wants us to go here now, but certainly our request

22   for the special master goes beyond just--

23        THE COURT:  Oh, that's right.  Go ahead, we

24   haven't finished.

25        MS. BRANNON:  Okay.  First of all, I want to

1   say that the Court's order last week solves many of the

2   prospective, if not all of the prospective, problems

3   regarding recording.  CCA was very quick to respond.

4   The cameras are down, there's new signage up.  Back in

5   the pods, there are different instructions on the

6   phones.  We've provided a list of our phone numbers that

7   can be blocked to the chief of security.  That

8   information and a way to do that has also been

9   communicated to CCA counsel.  So there have been great

10  strides in solving that problem.

11            What we're left with, though, is what do we

12  do with what's happened to date?  And we think there--

13  the Court needs to appoint a special master which, you

14  know, I think the Court is already talking about, but it

15  needs to be a much broader scope than what the

16  government has proposed.  And we've outlined that in our

17  proposed order to the Court.

18            THE COURT:  One thing I'm going to ask both

19  you and the government to do is to provide me with your

20  own description of the scope of duties.  I know that you

21  all agree to a scope that we've already talked about,

22  but particularly it would be helpful to have in writing

23  from you what the additional scope is.  And I know it's

24  in your order, but I think it would be easier if you

25  identified it specifically that way.  And Ms. Barnett

 1   can do the same.  But I'll hear from you now on just
 2   whatever other ideas you have.
 3           MS. BRANNON:  We think there are three
 4   reasons that the Court ought to appoint a special master
 5   with broader powers that we've described in the-- in the
 6   order.  The first is based on the government's response
 7   to date.  The second has to do with the defense's
 8   ability to investigate and the defense's perception of
 9   what's happened.  And the third is that it would be of
10   great benefit to the Court, we believe, to have this
11   information and to have it in an efficient,
12   authoritative, and orderly manner.
13           Since we started on this, since we first
14   discovered this, the scope of this continues, it's been
15   expanding.  It expanded to the phone calls, it expanded
16   to some things that the Court is going to hear from Ms.
17   Rokusek.  The defense simply cannot keep up with it.
18   And the defense doesn't have the tools and resources to
19   be able to access the information that a special master
20   could.
21           In this case we got wrong information
22   repeatedly from CCA.  We got wrong information from
23   other resources.  It took a lot of work to dig down, and
24   we still think we don't know the answers to so many
25   questions, despite our best efforts.  Communication

1    between the U.S. Attorney's Office and the defense on

2    this issue and on these issues has all but ceased.  Our

3    efforts to-- to work something out have completely

4    broken down.  And so-- and we certainly will undertake

5    what the Court has suggested, but we're making

6    absolutely no progress.

7            The government's response in this-- you

8    know, the Court has given the government an opportunity

9    to address these issues repeatedly and in other

10   circumstances, given the government an opportunity to

11   address these things.  We had a hearing last week, all

12   of this was laid out.  The Court gave seven days for the

13   government to respond.

14           Last night, last night we get a pleading

15   from the government that clouds the issues more than

16   clarifies.  They know the questions that we had, they

17   know the questions before the Court.  Has this happened

18   in other cases?  Do they do this routinely?  Have they

19   used it against other people?  We want to know those

20   things.  And in their response, or a lack of response

21   rather, they are silent on these issues.  And what we

22   read from that is, at the very least, the government

23   does not seem to understand the gravity and the

24   magnitude of what's before it.  Because otherwise, they

25   would have to have had a different response than they've

 1    had.

 2             When we look at this case and what's

 3    happened that we know about so far, the government's

 4    invasion into our attorney-client relationship is

 5    unprecedented.  We couldn't find anything even

 6    comparable to the degree of invasion and misconduct by

 7    the government that is before the Court.  This Court

 8    heard from both sides of the bar, we presented that

 9    evidence.  Heard from an expert, heard from our

10    investigator, heard from Ms. Rokusek.  And the Court

11    shut down the recording so that there would be no

12    further Sixth Amendment violation.  And in response to

13    that, the government still has not taken any remedial

14    action, has done nothing to answer the Court's

15    questions.

16             What we know is that this is not a case

17    where there-- this is not one case, this is not one

18    defendant, this is not one recording.  This is a

19    systemic en masse breach of the attorney-client

20    relationship that we don't even know the magnitude of.

21    We don't know what clients are involved, we don't know

22    what attorneys are involved.  And not only did CCA do

23    that, but in turning that over to the United States

24    Attorney, they exploited that information and used it

25    against defense counsel, and in a way that the Court is

1    going to hear more of today, and used it against our

2    clients.

3              And what's striking is that they were so

4    bold about it.  This is not some-- you know, this isn't

5    one rogue line attorney or this isn't some inexperienced

6    misjudgment.  The head of the Kansas City, Kansas

7    office, Kim Flannigan, the head of it, endorsed this,

8    used it, published it.

9              MS. BARNETT:  I'm going to object to this,

10   Your Honor.  This is just going far afield of what the

11   hearing should be about today.  I am only here to

12   address the issue of a special master and what we can

13   consent to.  But quite frankly, making these statements,

14   making allegations against my office and my colleagues

15   in my office when there's no show of proof of that in

16   any form whatsoever, except maybe some ex parte

17   discussion with the Court back in chambers or out here

18   without anybody else in the courtroom--

19             THE COURT:  There's been no ex parte

20   communications--

21             MS. BARNETT:  No.

22             THE COURT:  -- with this Court.

23             MS. BARNETT:  No, I know that, Your Honor.

24   But what I'm talking about is their request that the

25   Court take Ms. Rokusek's testimony in camera on

 1    something.  I can only infer from what Ms. Brannon has

 2    said here to the Court that these are going to be

 3    accusations against my colleagues.

 4            THE COURT:  I have no idea.  But what I will

 5    tell you, if I determine that it's not proper ex parte,

 6    I will stop and bring you all back in and have her say

 7    it in front of you.

 8            MS. BARNETT:  Thank you, Your Honor.

 9            MS. BRANNON:  If I-- if I may, Judge.  The

10    point of this is that the government had a chance to

11    respond to this and they have not.  The-- the Court

12    heard evidence from Ms. Rokusek about how it was being

13    used and that it was Ms. Flannigan and Ms. Tomasic that

14    were using it.  And the fact that they were so bold in

15    doing it gives us reason to believe that it's happened

16    in other circumstances.  That it's happened in other

17    cases.  That's why a special master needs to be brought

18    in to investigate that.

19            And it's very telling that in the

20    government's response, they do not deny that this has

21    happened on other occasions.  They do not deny that this

22    has been their practice and policy.  They had the

23    opportunity to inform the Court of this.  They had the

24    opportunity to come and help the Court sort this out.

25    And they didn't.  And what is not in their response also

1    says that we need a special master.  They never deny

2    that their agents or staff viewed it.  They were very

3    careful to say government counsel has not reviewed this,

4    but not that the agents and staff have not.  And

5    certainly their knowledge imputes to the counsel.

6    That's a critical issue.

7            They do not claim inadvertent possession.

8    They never claimed that this was the first time that it

9    happened.  They never claimed that it's the only time

10   that it's happened.  These are all questions that the

11   government could have been open about, could've brought

12   to the Court, but they chose not to.  Instead, they were

13   defiant and they did not give information.

14           And, Judge, we-- we are stunned by the

15   cavalier response of the government.  They shrug off the

16   constitutional issues here.  That response that they

17   provided to the Court, what they talk about is standing.

18   What they talk about is, "We don't have to tell you.  Go

19   litigate it widespread, let's just disperse this all

20   over the district."

21           We have this before this Court.  We have

22   these issues before this Court.  We've tried to do this

23   in an organized manner.  We've tried to do it in a

24   uniform manner so that this Court can look at this and

25   make some decisions about what has happened here.

1            What's happened, though, is the government,

2    in addition to not giving the Court information and in

3    addition to not taking any remedial action and not

4    abandoning this material and saying, "No, we weren't

5    entitled to it," they've done nothing.  Well, I take

6    that back, they've done something.  The attorneys who

7    were responsible for these violations are still in place

8    and still on this case.  And what they've done in the

9    time that has passed since the last hearing and this

10   hearing is they've become increasingly aggressive

11   against Ms. Rokusek to get her off that case.  That has

12   been their response in answer to our concerns about

13   these violations.

14           That is why a special master is needed;

15   because of the scope of this, because the government has

16   not responded, and because of the government's

17   continuing conduct in this.

18           The phone issues, this-- you know, our

19   filing yesterday is not the first time the phone issues

20   came up.  It came up in the evidentiary hearing.  This

21   Court ordered the phones to be shut down.  They knew

22   about this, and our inquiries about that have remained

23   unanswered.  So it's not that they just-- that they just

24   learned of it.  That's the first reason the Court ought

25   to appoint a special master.

1            The second reason is because of the defense.

2    We have come to this Court together.  We intervened in

3    the case.  The lawyers here who have been in this

4    courtroom last time and this time, they're not here

5    because they're interested in this, Judge.  They're here

6    because they're outraged.  Our-- our relationship with

7    our clients is sacrosanct.  And beyond the Constitution

8    and everything else, it deserves a very basic respect.

9    And they've just been derisive and dismissive of that

10   and say, "We don't care."

11           They're here to win.  They're not here to

12   help the Court find the truth.  And because of that, the

13   Court needs to appoint a special master.

14           You know, we're public defense lawyers.  And

15   the attacks on us and diminution of our obligations and

16   responsibilities, we just don't understand it.  I mean,

17   it's really been hard to get our heads around this, that

18   there would be a violation of this magnitude, this

19   brazen, that they would be willing to use and exploit in

20   this way.  It's been hard for us to understand that.

21           We don't know the scope.  We don't get it

22   yet.  We don't know how far this goes back.  We know

23   that CCA has recorded since 2008.  We have a lot of

24   suspicions, but we need a special master who has the

25   authority and the power of the Court to come in and

1    delve into these things and sort it out so the defense

2    can at least have some confidence in the integrity of

3    the system, which we don't have now.  And we will not

4    have if this is left to the U.S. Attorney's Office to

5    sort out, simply because of their behavior in this case.

6         They told us that CCA did not record.  They

7    knew that CCA did record.  They stated on the record to

8    this Court and to counsel, "We have these recordings.

9    We have these recordings of these meeting between

10   attorneys and clients."  They called Jackie Rokusek up

11   to watch them.  They were brazen about this.  "We have

12   these recordings."  They knew it.

13        And at the very time that Ms. Rokusek is up

14   viewing those audiotapes, Ms. Tomasic is sending an

15   e-mail to the Court saying, "Oh, I don't know if they

16   actually exist.  I don't know if they actually exist."

17   After they had the index, after they had worked with CCA

18   and the marshals to have a chart, after they had

19   threatened Ms. Rokusek, and after she's in that room

20   watching them, they have the temerity to tell this

21   Court, "We don't know if they exist.  Our information

22   was incorrect.  The marshals say they don't exist.  We

23   were probably wrong about it."

24        We're not going to rely on that office to

25   tell us anything.  We're not going to rely on that

 1    office to come in and say, "We're innocent, we didn't

 2    view it, it's okay," because we don't believe it.  And

 3    we have strong reason not to believe it.  And that

 4    evidence is before the Court.

 5              This is not just us up here talking and

 6    making accusations.  This is in evidence before the

 7    Court.  Their response to-- still to this, "Just trust

 8    us.  We're officers of the court.  We're telling you

 9    this, just trust us."  They've done nothing in this case

10    to earn that trust.  They've done everything to destroy

11    it.

12              Just to restore the integrity and the

13    confidence of the bar, of our clients, and of the

14    public, a special master needs to come in and explore

15    these issues because it is not just about what's on this

16    index sheet, it goes a lot further than that.  What

17    they've done is they've-- they've put this one pleading

18    in front of the Court.  And it's a pleading that is very

19    selective in the facts and it's wrong in the law.  The

20    Court cannot rely on the U.S. Attorney's Office either

21    to present what is actually going on in this case.  They

22    don't even acknowledge the statement of Ms. Rokusek and

23    what went on there.  It's not even given any credence at

24    all.

25              When Ms. Tomasic is in the position of

1    telling the Court that this evidence exists, telling Ms.

2    Rokusek it exists, using it to try to get her off the

3    case, and then turning around and saying, "It doesn't

4    exist," when she knew it did, that doesn't float.  And

5    what's happened now is instead of the government coming

6    in and trying to reconcile it or trying to explain it,

7    they simply embraced it and they've gone with that

8    story.  That does nothing to help the Court sort this

9    out.  Absolutely nothing to help the Court get to the

10   truth in this.

11            I want to talk just-- just for a minute

12   about their written response, because we got it at 9:00

13   last night.  But in pointing out that the Court can't

14   rely on what they present, I want to-- the *Calandra*

15   case, it's a case that-- well, it's inapt here because

16   it talks about a different section of the rule, and

17   Footnote 6 explains that.  *In Re:  Grand Jury Subpoenas*

18   talks about a challenge to the grand jury subpoena.

19   We're not challenging that, we're challenging what

20   happens with the materials.

21            And by the way, we did not know that this

22   material was obtained by a grand jury subpoena until the

23   government provided it to us an hour before the hearing

24   last week.  We tried to find out how they got it, but we

25   couldn't.

 1              THE COURT:  As an aside, I'm not clear on

 2    how the audio-recordings-- do you know whether those

 3    were grand jury or otherwise?

 4              MS. BRANNON:  We have no idea.  I want to

 5    point out that the--

 6              THE COURT:  Do you know, Ms. Barnett?

 7              MS. BARNETT:  I don't.  I can ask, Your

 8    Honor, and find out for the Court right now if you want

 9    me to.

10              THE COURT:  All right.  Go ahead.

11              MS. BRANNON:  You know, I would point out

12    that the evidence before the Court is that they want

13    some sort of subpoena to hand this out, except if it's

14    the marshal's office, because the marshal's office owns

15    this material.  So if it was obtained through the

16    marshal's office, we wouldn't know about it.  That's why

17    when we tried to track it down when we subpoenaed

18    records from CCA, because surely they would have some

19    record of it, they didn't.  That's an example of the

20    limitations on the defense and why we can't go fully

21    litigate this on our own.  We need a special master who

22    has the authority to find these things out.

23              THE COURT:  All right.  So tell me again,

24    when you tried to track down what from CCA you couldn't

25    get an answer?

1    MS. BRANNON:  We wanted to know how these

2  recordings got into the United States Attorney's hands.

3    THE COURT:  All right.  If it was-- there

4  was a CCA custodian who talked about if we-- if CCA

5  receives a subpoena, they put it in the detainee's file.

6  But a "Grand Jury" subpoena is not going to have

7  somebody's name on it.  I mean, this one didn't at

8  least.  So it didn't go in anyone's file.

9    And so you did try to find the subpoena or

10  ask them and they didn't have it and it could've been

11  because they didn't think they could disclose it because

12  it had grand jury on it, or it could've been because

13  they couldn't find it.  But in any event, you weren't

14  able to get it?

15    MS. BRANNON:  Right.  The 17(c) that the

16  Court signed off on was very clear.  One thing she did

17  say is they don't have a central repository for these

18  things.  So we don't even know if they have the record

19  capability to find it, but we couldn't.  We didn't know

20  how they got it.  We didn't know if it was just a

21  request through the U.S. Marshal's, and so that's why we

22  don't know how they get the phone calls.  Maybe it's a

23  grand jury subpoena, we don't know.

24    But to come in and argue that we don't have

25  standing to object to a grand jury subpoena when we

 1  didn't know anything about it when we wrote the motion
 2  certainly diverts away from the real issues.
 3          The government cites the *Floyd versus United*
 4  *States*, as well, which is a Tenth Circuit case.  If the
 5  Court reads that, that fully supports our position,
 6  because the government has attacked our standing under
 7  Rule 41(g).  In that case, it says that the government
 8  had not filed charges against the person did not deprive
 9  the Court of jurisdiction under Rule 41.  Just because
10  we have not been charged in this case does not deprive
11  the Court of jurisdiction under Rule 41.
12          The other thing I will say to that is I did
13  file this motion in a separate case.  I filed a similar
14  motion in United States versus Brenda Wood.  I don't
15  have the case number in front of me.  As part of that
16  motion, I asked the Court to grant me leave to
17  participate in the hearing here because the issues so
18  overlapped.
19          THE COURT:  You asked that in the Brenda
20  Wood motion?
21          MS. BRANNON:  Yes.
22          THE COURT:  Frankly, I think there's been
23  over 30 Rule 41 motions filed--
24          MS. BRANNON:  Yes.
25          THE COURT:  -- in my-- in my caseload.

1    Judge Murguia has had them, other judges have had them.

2    And I can only speak for myself, I didn't really look at

3    those yet because I understood that it was probably-- at

4    least some of the relief that was sought would be

5    hopefully cured in this case, but-- so I wasn't aware

6    that you had asked for that in that particular motion.

7              MS. BRANNON:  I certainly didn't mean that

8    as a criticism.  The point of it is that that motion is

9    open and pending before the Court.  The government has

10   not objected to it.  And if the Court sustained that,

11   then that would-- their other objections to the standing

12   of the Federal Public Defender evaporate, not that those

13   were valid objections.  But if the Court sustains that

14   in Brenda Wood, we have every right to be here and

15   participate in this hearing.

16             I also don't understand that they bring this

17   up a week after the hearing, after sitting through

18   that-- that evidence.  I don't know if they're asking

19   the Court to-- to strike all the evidence, to not have

20   heard it, what they think should happen to it by raising

21   standing at this late date.

22             THE COURT:  Well, the evidence is in the

23   record.  And as I stated before, irrespective of that

24   standing issue, there are people here in this courtroom

25   that have standing in the Lorenzo Black case.  I'm not

1  saying that you don't have standing, I just-- I think

2  it's an issue that doesn't really matter for purposes

3  of-- of resolving.  There are a number of defendants

4  that have moved to join, so it's properly before me

5  either way.

6          MS. BRANNON:  I would say, too, I think it's

7  our responsibility as the Federal Public Defender's

8  Office to take the lead on these things.  We have the

9  resources available and we can-- we're not subject to

10  the same sorts of attacks on our livelihood that private

11  counsel are.  I think it's our responsibility.  And

12  that's one reason we did it.  And it's very important to

13  us to take the front line when we can, and that's what

14  we have done or tried to do here.

15          The last thing that we would point out; a

16  special master has to be of benefit to the Court.  There

17  are so many wide-ranging issues.  This continues to

18  expand and compound.  The government's response has not

19  been helpful.  The scope that we've provided and

20  suggested to the Court, you know, it's not limitless.

21  We've identified the issues.  This has to be beneficial

22  to the Court.

23          And as you noted, there have been a number

24  of other motions filed in other cases.  Rather than

25  litigate those independently, as the government

1    suggests, a special master could go through the facts

2    and make recommendations that would allow some

3    consistency in the outcome of those cases.  To-- to file

4    something in front of a court, a suppression issue or

5    something of those-- like that, to say we're going to

6    hold that until the special master is done with that

7    work, because that special master will have a report--

8    findings of fact and recommendations that will inform

9    hopefully every other motion that is based on this.

10   It's orderly.  It's efficient.  It's economical.  It's

11   the best way to proceed.

12           The government's breach here was illegal.

13   Their response defies credibility.  They denied

14   responsibility.  There's no reason to think that they

15   are going to help sort this out.  We have limitations

16   and we want the integrity of a special master to sort it

17   out.  That's what we have to present to the Court.

18           THE COURT:  All right.  Thank you.

19           MS. BRANNON:  We have a lot of other reasons

20   we think, but I think that's-- those three reasons are

21   enough for the Court to grant the scope of our request.

22           THE COURT:  All right.  Unless anyone has

23   anything else, I would like to have the ex parte part of

24   this hearing.  But before you all leave, I will tell you

25   this much, I am going to appoint a special master.  I'm

1   going to invite the government and the FPD to provide me

2   with a written description of duties that you would

3   like.  I've heard your argument and I know it's imbedded

4   in your motion, Ms. Brannon, but I'd like a job

5   description, if you will, from both of you.  Ultimately,

6   I'll make the decision about the scope of the

7   appointment.

8            I've given this a lot of thought.  I'm going

9   to have to have some ex-parte conversations with the

10  defendants or at least with-- actually with the case

11  budget attorney, Cari Waters, because-- and with Ms.

12  Shaneyfelt perhaps, because this is going to be,

13  needless to say, a very expensive enterprise.

14           I've given this a lot of thought in terms of

15  how could-- I mean, what could we start with that

16  hopefully would not cost, you know, an extraordinary

17  amount of money.  And that's why I was trying to hone in

18  on, you know, what is the scope of review of the

19  video-recordings, what is going to be the scope of

20  review of the audio-recordings.  But the-- I guess the

21  threshold question is, what are we trying to accomplish

22  here with even having a special master review all of

23  this?

24           So, for example, if there is a drive that

25  has nothing but attorney-client contacts or perhaps

1  other things such as people walking into the

2  attorney-client room or a person just sitting there

3  waiting on their attorney or some other professional to

4  show up, I don't think it makes a whole lot of sense for

5  us to spend a half a million dollars having someone go

6  through that or a quarter million dollars having someone

7  go through that and segment out this belongs to this

8  lawyer and this belongs to that lawyer and their client

9  when-- I mean, there's no purpose for that.

10            I mean, where this all started was the

11  government or the grand jury subpoenaed

12  video-recordings, presumably because the government or

13  the grand jury, whoever, thought there would be

14  evidentiary value in seeing the-- the non-verbal

15  behavior of people that are targets of the

16  investigation.  Who they were talking to, even if they

17  couldn't hear what they were saying, where they were,

18  maybe hand-to-hand transactions, whatever.  That's what

19  I believe the government thought, at least in part, it

20  was getting through this subpoena.

21            What they got through the subpoena went

22  beyond that.  It went into attorney-client rooms.  And I

23  don't know if that was intentional or inadvertent.  But

24  in any event, they received that information, which

25  raised all of the issues before us, including a very

 1    serious Sixth Amendment violation.  Well, actually

 2    hundreds of Sixth Amendment violations.  Every-- every

 3    person has their own right.

 4              So what are we trying to accomplish with

 5    having somebody go through and cull a drive that let's

 6    just say has nothing but things that are either-- that

 7    don't show anything because the defendant is just

 8    sitting in a room, or that show the defendant and their

 9    non-verbal interaction with somebody from their defense

10    team?  If that has no evidentiary value because it's

11    privileged, why have somebody go through it and slice

12    and dice it anyway?  That was sort of my initial

13    impression, even last week, about this.

14              On the other hand, if there's a drive that

15    has mixed camera angles, such that there could be

16    evidentiary-- things of evidentiary value, for all of

17    the reasons that the government first subpoenaed this

18    stuff to begin with, then it makes sense perhaps to have

19    somebody go through and spend a lot of money and time

20    trying to sort that out.  Again, that's based on the

21    assumptions that it gets us somewhere, that it has

22    evidentiary value to the government.  And maybe it

23    doesn't.

24              One of the types of relief that this Court

25    could impose, either through a Rule 41 motion or some

Case 2:16-cr-20032-JAR    Document 118    Filed 08/22/16    Page 66 of 73

16-20032-JAR    USA v. Lorenzo Black, et al.    08.16.16    66


 1    other type of motion, would just to be to exclude the

 2    evidence altogether.  That might save us all a lot of

 3    money and a lot of time and a lot of grief if we know

 4    that none of those-- neither one of those drives, for

 5    example, are going to be used.  But perhaps Drives 1

 6    through 4 would be used, assuming that everyone could be

 7    assured that there weren't any privileged things going

 8    on there because the special master had done a sampling.

 9            So these are just some of the things I'm

10    sorting through in trying to determine how to go about

11    hiring a special master and what the scope would be and

12    how much money we might spend.  And frankly, none of you

13    have to worry about that, but I do, because we have a

14    limited number of dollars available at a Circuit level

15    for cases, even huge cases and complex cases with unique

16    issues like this.  And so I'm trying to be allegiant and

17    a good shepherd of-- or steward of taxpayer dollars in

18    that sense.  So I've been trying to figure out how to

19    stage this.

20            I will tell you this; I'm going to-- I'm

21    going to retain a special master.  I'm going to invite

22    your-- you know, your input on what the duties shall be.

23    But I will tell you that the appointment order, at least

24    what I'm thinking now, will give the special master

25    "Here's what you start with," but is not going to

1    foreclose the special master from going forward.

2    Frankly, I don't know, there may be a need to go into

3    different avenues.  Today is the first day that I really

4    heard something that gave me concern and I saw

5    something, a demonstrative exhibit, that gave me concern

6    about audio-recordings.  I mean, there was some

7    suggestion of that at the last hearing, but it's more

8    specific now.  And that, as you know, poses all kinds of

9    issues.

10    So a special master appointment order, in my

11    view, will give them a starting place and will leave the

12    door open for the special master to go further if I

13    think that's appropriate.  And obviously that would be

14    in consultation with you all.

15    To the extent the special master thinks that

16    they see things that are-- that-- that raise ethical

17    questions, I think the special master and I think most

18    special matters would agree they're obligated to pursue

19    that avenue.  That's not something they can ignore.

20    They're officers of the court, they're lawyers

21    typically.

22    And so to the extent, you know, Ms. Brannon,

23    you've raised those kinds of issues and concerns, no

24    matter what the scope of the special master's

25    appointment is, they're not going to be foreclosed from

1    looking into that and making recommendations or asking

2    the Court if they can go further or whatever, because

3    they would have some obligation to pursue that if they

4    thought they saw something like that.

5              So I don't think I'm going to get an order

6    out until next month sometime.  I'm going to have to be

7    in conference with the case budgeting attorney, the

8    Tenth Circuit executive.  We're going to have to come up

9    with some idea of how much we can expend and include in

10   the case budget for this.  And with that information,

11   then I can-- I'll have some idea about who we can hire.

12   I have some-- actually, I have some idea now, but I'm

13   not sure we can afford the person that I think might do

14   perhaps the best job.  So don't look for an order from

15   me until next month.

16             In the meantime, all other motions will stay

17   under advisement.  I will look for any further response

18   to the government from this latest filed motion to

19   impound audiotapes.  And I will be issuing an order--

20   before I issue the special master appointment order, I

21   am going to issue a clawback order.  And it may be a

22   very short order, because I think the key is to get all

23   of those into the Court's possession until further order

24   of the Court and also to claw back the additional

25   video-recordings.

1    In fact, I would invite-- Ms. Brannon, if

2    you will submit a proposed order on clawing back the

3    additional video-recordings that weren't-- that have

4    been recorded since the subpoena until they shut off the

5    cameras or took them out of the rooms in CCA. So an

6    order on that. And then if you want to submit a

7    proposed clawback order on the audio-recordings and the

8    appropriate time frame, I'll consider that one as well.

9    Run that one by Ms. Barnett. But I'd like to get both

10   of those orders filed fairly soon. And then we'll work

11   on getting the special master order done sometime early

12   to mid-September.

13        Is Mr. Naseem here, by the way, today?

14        MR. NASEEM: I am, Judge.

15        THE COURT: Oh, there you are. I don't have

16   anything to take up with you specifically except to say

17   that I do want to have another discovery conference with

18   the parties sometime in mid-September as well. So we'll

19   be trying to get that scheduled on the other types of

20   discovery. And to the extent we can deal with this,

21   too, we'll do that, but I doubt we can.

22        Is there anything else that you'd like to

23   say? Because you have been appointed as the lead

24   discovery attorney in this case.

25        MR. NASEEM: Nothing at this particular time

1    that hasn't already been said, only that we will

2    continue to try to push the case forward with the

3    discovery that we have, minus some of these things, so

4    that the attorneys in the case can start to work on the

5    case with their clients and-- and we'll work with the

6    government to get that done.

7            THE COURT:  Okay.  All right.  Thank you.

8    All right.  Unless there's anything more, we will recess

9    the open court hearing, we'll have an ex parte hearing

10   in which I'll hear from Ms. Rokusek.  Let's take about a

11   10-minute break in that interim.

12           Okay.  Let me make a record of something

13   else.  Mr. Bishop is here and Ms. Rowlette is here.  And

14   I understand that there's some transportation issues

15   with Mr. Bishop.  He's not sure his car will make it

16   back to Sedalia; is that correct?

17           MS. DODGE:  That's correct, Your Honor.

18           THE COURT:  So Ms. Rowlette is willing to

19   travel in tandem with him?

20           MS. DODGE:  Yes.

21           THE COURT:  And they have pretrial

22   conditions of release that avoid-- order them not to

23   contact each other.  But just in this limited instance,

24   I'm going to relax that condition so that Mr. Bishop is

25   not out on the highway with a failed car.  And he can--

 1    if something happens to his car, he can-- Ms. Rowlette

 2    can stop and pick him up and take him the rest of the

 3    way.  But once she delivers him to Sedalia, the contact

 4    order goes back into place.

 5            I-- my staff has talked to Marlin Carlson

 6    from Probation, and he is agreeable to that modification

 7    for purposes of today.  And I think Mr. Carlson is maybe

 8    even in the courtroom.  But in any event, there's been a

 9    conversation about it.  And so just so everybody

10    understands, I am modifying that condition just for

11    today to assure that Mr. Bishop can get home safely.

12            MS. DODGE:  Thank you, Your Honor.

13            THE COURT:  All right.  So let's-- yes, Mr.

14    Redmond.

15            MR. REDMOND:  Your Honor, I apologize.  One

16    thing, I stole the exhibit.  I would like to tender that

17    to the Court.

18            The Court had also given us an opportunity

19    at the last hearing to suggest possible names of special

20    masters.  We don't have a whole lot of experience in

21    that particular question, but one name that did come to

22    mind was Judge Malone from Douglas County who just

23    retired and I think would have the time available to do

24    that.  He's got a really good reputation in law

25    enforcement circles.  We didn't really have too much to

```
 1   add-- to add to that.  We're just not familiar with the

 2   area.  May I approach, Your Honor?

 3              THE COURT:  Yes.

 4              MS. BARNETT:  And, Your Honor, if I might.

 5   Another name I had thrown out, or two names, were the

 6   retired magistrate judges, Karen Humphreys and Donald

 7   Bostwick.  I don't know if they would have time or an

 8   interest, but I just was thinking that since they are

 9   recently retired - or I guess Judge Bostwick a few years

10   ago - but both are very familiar with our system and

11   would be familiar with these kinds of issues.

12              THE COURT:  All right.  I appreciate all of

13   that input.

14              All right.  All right.  So let's be in

15   recess for about-- let's see, it's ten after, 3:25.  And

16   then we'll come back, I'll take this up with Ms. Rokusek

17   ex parte.

18              (3:10 p.m., proceedings recessed.

19              (The remaining proceedings are sealed and

20   require a Court order to be transcribed).

21

22

23

24

25
```

```
 1                    C E R T I F I C A T E

 2

 3

 4      I, Kelli Stewart, a Certified Shorthand Reporter and

 5   the regularly appointed, qualified and acting official

 6   reporter of the United States District Court for the

 7   District of Kansas, do hereby certify that as such

 8   official reporter, I was present at and reported in

 9   machine shorthand the above and foregoing proceedings.

10      I further certify that the foregoing transcript,

11   consisting of 72 pages, is a full, true, and correct

12   reproduction of my shorthand notes as reflected by this

13   transcript.

14      SIGNED August 22, 2016.

15

16

17

18            /s/ Kelli Stewart
                 _____

19            Kelli Stewart, CSR, RPR, CCR, RMR

20

21

22

23

24

25
```