**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case No. 16-20032-JAR** |
| ) | |
| **LORENZO BLACK,** ) | |
| **KARL CARTER,** ) | |
| **ANTHON AIONO,** ) | |
| **ALICIA TACKETT,** ) | |
| **CATHERINE ROWLETTE,** ) | |
| **and** ) | |
| **DAVID BISHOP,** ) | |
| ) | |
| **Defendants.** ) | |

**UNITED STATES' RECOMMENDATION RELATED TO SCOPE OF SPECIAL**
**MASTER AND PROPOSAL NOT TO RETAIN CERTAIN EVIDENCE**

The United States of America, by and through undersigned counsel,

provides the following facts concerning the acquisition of surveillance video

from Corrections Corporation of America-Leavenworth (CCA) and

recommendations related to the scope of the duties of the Special Master.  In

addition, in an effort to conserve valuable court resources, the United States

proposes not to seek return of video taken from the attorney-client visitation

rooms, provided the excised video evidence is retained by the Special Master,

as discussed further below.

**RELEVANT FACTS CONCERNING THE UNDERLYING INVESTIGATION**

In September 2015, the Kansas Bureau of Investigations began an

investigation into a large-scale conspiracy to introduce contraband and illegal

drugs into CCA after a confidential informant provided information about an inmate selling synthetic cannabis inside the facility.  Shortly thereafter, the United States Marshals Service, United States Secret Service, and Internal Revenue Service-Criminal Investigations joined the investigation.  During the investigation, agents have learned through interviews of informants housed at CCA, that the contraband conspiracy involves numerous inmates, along with CCA guards, and other individuals outside of CCA.

Agents identified one source of supply, Lorenzo Black, who provided contraband to a CCA officer, Anthon Aiono, who brought contraband into the facility and distributed it to CCA inmates.  Those inmates sold the contraband to other CCA inmates.  The money was exchanged between inmates through wire transfers initiated through telephone calls to conspirators outside of CCA, including Alicia Tackett, Catherine Rowlette, and David Bishop, who facilitated wire transfers in payment for the drugs and contraband.

Agents conducted a financial investigation of the wire transfers and inmates' commissary accounts and uncovered evidence showing thousands of dollars were proceeds of drug and contraband distribution.  A review of defendant Karl Carter's account revealed that he had received $14,898.80 in his commissary account.

On April 8, 2016, agents observed a meeting between defendants Black and Aiono (who was a CCA corrections officer at the time).  Following the meeting, law enforcement officers stopped both vehicles and found $2,000 in Aiono's possession and suspected methamphetamine in Black's possession.

That evening, agents executed a court-authorized search warrant at CCA. Agents searched the inmate housing pods and located many items of contraband at the facility, including synthetic cannabis, tobacco, methamphetamine, and drug paraphernalia.

Since executing the search warrant at CCA, agents have continued their investigation. Based on review of financial documents including wire transfer records, agents have identified approximately 95 inmates as potentially involved in the drug and contraband distribution conspiracy inside CCA.

## RELEVANT FACTS CONCERNING THE RECEIPT OF THE CCA VIDEO

### A. No CCA video recordings depicting attorney-client meetings has been viewed by any employee of the United States Attorney's Office or any law enforcement officer.

The most important fact for the Court and the Special Master to consider is the simple fact that no employee of the United States Attorney's Office or law enforcement officer has viewed any recording of attorney-client meetings provided by CCA. The government previously made the Court aware of the fact that no Assistant United States Attorney for the District of Kansas has viewed video of attorney-client meetings in its pleading (Doc. 110, at 6). At the August 16, 2016 hearing regarding the appointment of the Special Master, the Federal Public Defender (FPD) pointed out that the government's motion was silent as it relates to whether any law enforcement officer has viewed the video. Notwithstanding the FPD's statements on this issue, the government was silent because it wanted to be as accurate as possible with regard to this very important and sensitive topic. The government, after communications with law

enforcement officers assigned to this investigation and a retired law enforcement officer previously assigned to the investigation, confirms and informs the Court and the Special Master that no prosecutor or law enforcement officer has viewed any CCA recordings depicting any attorney-client meetings. As further clarification, a KBI Special Agent briefly viewed a portion of the CCA recordings that contained approximately sixteen camera views on his screen at one time. One of those sixteen camera views depicted an empty interview room, and the agent is certain there were no attorney-client meetings occurring at the time. The only persons known to the government who have viewed any video containing an attorney-client meeting are defense counsel for Richard Dertinger in a separate case; her investigator; possibly the Coordinating Discovery Attorney in this matter; and whoever was present during the in-camera presentation of the video on August 9, 2016.

Additionally, the criminal coordinators for each of the three offices for the United States Attorney for the District of Kansas have polled every prosecutor in the District, and no prosecutor in this District has, in any other case, viewed video of an attorney-client meeting from CCA or any other detention facility.

### B.    Counsel for the government did not intend to obtain video recordings of attorney-client meetings.

As set forth in the government's First Response (Doc. 110), on April 12, 2016, a law enforcement agent served a subpoena on CCA's record custodian seeking "all video footage or still images currently retained by the Corrections

4

Corporation of America (CCA) depicting any internal or external surveillance video or still image taken between July 2014 and April 12, 2016 at the CCA facility in Leavenworth, Kansas." The subpoena was broadly drafted because the investigation revealed a widespread conspiracy to distribute drugs and contraband within the facility. For example, the investigation has revealed that drugs and contraband were transferred between inmates in the law library, medical facility, twelve-step program, outdoor recreation areas, various pods in which inmates are housed, and church. There have been no allegations that drugs or contraband were distributed in the attorney-client meeting rooms. Counsel for the government did not intend to obtain any recordings of attorney-client meetings when issuing the subpoena. On or about May 17, 2016, CCA provided six drives, each three TB in size, to the government containing surveillance footage from the CCA facility in Leavenworth.[1] A Secret Service Agent then generated a copy of the CCA video recordings for the U.S. Attorney's Office. Upon receipt of the video recordings, the litigation support specialist in the U.S. Attorney's Office noticed that the recordings were not accompanied with a player. She coordinated with the Secret Service to obtain a player for the recordings.

---

[1] In reality, the government only obtained surveillance footage for a limited period based on the retention period of CCA's surveillance system, which is estimated to be from approximately January 2016 to May 2016. The government previously agreed not to view the surveillance footage based on an assertion of attorney-client privilege. Thus, the government is unable to verify the exact time frame of the CCA surveillance footage that was in its possession until all of the video was relinquished to the Court on August 9, 2016.

On April 26 and 27, 2016, counsel for the government emailed all counsel of record in this case explaining that they needed to provide external drives on which to download a substantial amount of surveillance footage obtained from CCA.[2]

> **C.    Counsel for the government was coordinating with defense counsel of record regarding other potentially privileged material, and a filter team was in place to review any potentially privileged material.**

On May 24, 2016, the parties held a meet and confer to address the large volume of discovery in this case.  During the meeting, counsel for the government informed all counsel of record that the government was in the process of obtaining all surveillance at CCA during a particular time frame. In advance of the meet and confer, counsel for the government sent an email to all counsel of record explaining:

> Seven computers were seized and imaged from the "law libraries" inside CCA.  Because the computers arguably may contain attorney/client material generated by the inmates, we should work together to exclude that material from the case agents' review.  I suggest the following procedure:
>
> At the meet and confer, all attorneys should weigh in on search terms to identify potential attorney/client material.  Once those search terms are generated, a "taint" team of agents will generate all data from the "law library" computers containing those terms. That data will be provided to defense counsel for review during an agreed upon time frame.  Defense counsel should identify any documents they believe contain privileged attorney/client material. The "taint" team of agents will then review the privileged material

---

[2] Discovery related to this case has also been disseminated in other cases, as needed, because the conduct at issue may serve as the basis for a sentencing enhancement in those other cases. No counsel in this case or any related case has provided the government with external drives on which to download the CCA surveillance footage, before it was relinquished to the Court on August 9, 2016.

identified by defense counsel as attorney/client and verify the privilege for the government. All information not identified by defense counsel as privileged will be reviewed by the case agents as part of discovery.

Please let me know if you disagree with the proposed procedure.

During the meet and confer, counsel for the government explained, based on cooperator statements, it was believed that inmates used the law library computers to communicate about drug and contraband trafficking inside the facility. Defense counsel were particularly concerned that the law library computers would likely contain communications from defendants other than those charged in the case, including past clients of the attorneys of record and inmates represented by other attorneys. At this point, the law library computers have been digitally imaged, and all documents contained on the computers are ready for review. No one to date has reviewed the documents.

On July 13, 2016, counsel for the government emailed Michael Jackson, attorney for Catherine Rowlette, and asked that he coordinate with defense counsel to set up a meet and confer with all counsel of record to discuss discovery issues. The parties agreed to meet and confer on July 21, 2016. On July 13, 2016, this Court contacted all counsel of record *sua sponte* and set a hearing regarding discovery issues for July 21, 2016.

### D. During the July 21, 2016 hearing, counsel for the government first brought to the Court's attention the existence of potential attorney-client video recordings.

During the July 21 hearing, the Court inquired: "And there are cameras that are identified with particular—the visitor room and the attorney/client room as well, or no?" Counsel for the government responded: "Yes. Except

that there is no—there are no audio in attorney/client unless someone at CCA, an employee, took it upon themselves to turn on the audio. But I don't believe it's recorded. It's just that it would allow a particular CCA employee to listen in without recording if—if the employee believes something was afoot that he needed to be aware of." At the time of the hearing, counsel for the government believed that CCA's attorney-client rooms contained video recorders based on descriptions provided by a cooperating inmate and his attorney during the course of this investigation. Counsel for the government was unaware whether CCA actually recorded or simply monitored attorney-client meetings. Further, counsel for the government was unaware that CCA provided recordings of the attorney-client rooms to the government in response to the subpoena. (At no point during this hearing did counsel or the Court demonstrate concern that video surveillance of attorney-client meetings may be available as part of the discovery. At the hearing, counsel for the government spoke with counsel for one defendant about raising potential attorney-client communications associated with the law library computers. It was agreed the issue would be first addressed at the next meet and confer before bringing the matter to the Court's attention.) Counsel for the government spoke with a case agent and instructed him to notify her if he encountered video recordings of attorney-client meetings. Counsel for the government also instructed the case agent not to view any attorney-client meetings.

On July 25, 2016, the government provided to defense counsel of record an index of camera angles related to the CCA video recordings. Within the

index, as relevant to this proceeding, certain camera angles are marked
"Attorney Room, Attorney Room 4, Attorney Room 5, Attorney Room 6, Attorney
Room 7, Attorney Room 8, Attorney Room 9."   An employee of CCA prepared
the index and provided it to the Litigation Support Specialist at the United
States Attorney's Office.  Counsel for the government first reviewed the index
on August 4 or 5, 2016.

### E.  After defense counsel verified CCA provided recordings of attorney-client meetings, the U.S. Attorney's Office immediately secured the recordings

On August 4, 2016, counsel for Richard Dertinger in a separate case
(case number 14-20067-CM) contacted the government and asserted an
attorney-client privilege regarding the CCA video recordings.  (Mr. Dertinger is
one of the other inmates at CCA believed to be involved in this drug trafficking
and contraband conspiracy at CCA; therefore, some of the discovery in this
case was provided to his counsel as it may be used for Mr. Dertinger's sentence
hearing.)  The government, having never reviewed the footage, agreed not to
review the footage, and instructed anyone else with access to the footage not to
review it until any litigation pertaining to the attorney-client privilege was
resolved.  On August 5, 2016, the CCA video recordings were marked as
containing potential attorney-client material and placed in the government's
vault.  The footage, along with footage that was in the possession of the United
States Secret Service, all footage having never yet been viewed by the
government, was provided to the Court on August 9, 2016.

On August 4, 2016, Shazzie Naseem was appointed as Coordinating Discovery Attorney in this case.   On August 5, 2016, counsel for the government met with Mr. Naseem to discuss discovery.   Government counsel advised Mr. Naseem that counsel for Mr. Dertinger was reviewing footage to verify whether attorney-client meetings were recorded in any fashion.   Mr. Naseem asked government counsel about the quality of the video, and counsel suggested that he talk with counsel for Mr. Dertinger.

**RELEVANT LAW**

### A. Attorney-Client Privilege Generally

While the government has no desire to review any video footage of attorney-client meetings on the CCA video, a review of the relevant law is helpful.[3]   The attorney-client privilege is one of the oldest recognized privileges for confidential communications.  *Swindler & Berlin v. United States*, 524 U.S. 399, 404 (1998).  "The privilege is intended to encourage 'full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice."  *Id.* (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)).

"A party claiming the attorney-client privilege must prove its applicability, which is narrowly construed.  In order to be covered by the attorney-client privilege, a communication between a lawyer and client must relate to legal advice or strategy sought by the client."  *United States v. Merida*,

---

[3] We discuss a couple of caveats in Section II, infra.

___ F.3d ___, 2016 WL 3741867, *5 (10th Cir. July 12, 2016) (quotations omitted, emphasis in original).

The party seeking to assert the attorney-client privilege has the burden of establishing its applicability. *In re Grand Jury Subpoenas*, 144 F.3d 653, 658 (10th Cir. 1998). The privilege is governed by common law and is to be strictly construed. *Id.* The party must bear the burden as to specific questions or documents, *not by making a blanket claim. Id.* (citing *In re Foster*, 188 F.3d 1259, 1264 (10th Cir. 1999) (emphasis added)).

The attorney-client privilege protects disclosure of communications, not the underlying facts of the communication. *Upjohn*, 449 U.S. at 395. "[I]t is important to bear in mind that the attorney-client privilege protects communications rather than information; the privilege does not impede disclosure of information except to the extent that the disclosure would reveal confidential communications." *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1037 (2d Cir. 1984).

There is very little case law on the issue of whether nonverbal interaction can be protected by the attorney-client privilege. In a different context, the Wisconsin Supreme Court held that an attorney's testimony concerning her "opinions, perceptions, and impressions" of the defendant's competency violated the attorney-client privilege because it was "premised upon and inextricably linked to confidential communications." *State v. Meeks*, 263 Wis. 2d 794, 822-23, 666 N.W.2d 859, 873 (Wis. 2003). In so holding, the Wisconsin Supreme Court noted that "[c]onfidential communications must be

interpreted to include both verbal and non-verbal communications in order to preserve inviolate the integrity of the attorney-client relationship." 263 Wis. 2d at 823.

The attorney-client privilege is not as broad as the work product privilege, as it only covers confidential communications between attorney and client, whereas the work product privilege is not limited to communications. *See In re Sealed Case*, 676 F.2d 793, 809 (D.C. Cir. 1982). Therefore, the burden is on the client of the FPD, or other person asserting a privilege, to prove that the CCA video contains communications between client and attorney that are subject to the privilege and were not otherwise waived. Based upon testimony presented at the August 9, 2016 hearing, the government understands the videos at issue do not contain audio and therefore would only constitute privileged communication if the client and attorney engaged in protected non-verbal communication. Even then, the party asserting the privilege must show that the communication is covered under the privilege. (*See Merida*, 2016 WL 7341867 at *5, also *United States v. Jenkins*, 178 F.3d 1287 (4th Cir. 1999) (holding that, although audio and visual recording of attorney-client confidential conversations was improper, it did not automatically violate the defendant's Sixth Amendment right absent showing of prejudice).)

Thus, before the Special Master could find any of the videos to be privileged, he or she would have to determine whether the video reveals a confidential communication, and, if so, whether the defendant suffered any

prejudice.  Given that no prosecutor or agent has viewed the videos, it would be extremely difficult to find actual prejudice.

### B. Non-Communications

Not all communications between and attorney and client are privileged. For instance, in *United States v.* Smith, the Eastern District of Virginia found that defense counsel's showing of a video to a defendant of a controlled buy, where the informant was subsequently murdered and the defendant charged with the murder, was not a "communication" covered by privilege.  2008 WL 3890531, *2 (E.D. Va. Aug. 21, 2008) (unpublished).  The government was permitted to call defense counsel at trial to testify that he showed his client the video.

Similarly, the Tenth Circuit has held that no privilege applies where an attorney passes on information to a client that the attorney obtained someplace else.  *In re Grand Jury Proceedings*, 616 F.3d 1172 (10th Cir. 2010).  *In re Grand Jury Proceedings* involved a grand jury subpoena issued to two attorneys seeking their testimony.  The attorneys sought to quash the subpoena to keep the government from asking them questions concerning information the attorney received from the government then communicated to the client.  The Tenth Circuit held, "[t]hese questions thus requested 'conduit' information-- whether a third party's statement was passed along by the attorney to the client.  Where questions only request information regarding communications where the attorney was acting as a 'conduit' for non-confidential information, the client may not invoke the attorney-client privilege."  *Id.* at 1183.

These cases illustrate that the analysis is highly fact-driven and that, even if the CCA video in question were to show a defense attorney showing a document to a client, that visual depiction is not necessarily a communication that is covered by the privilege.

### C.  The cases cited by the FPD are distinguishable

The FPD cites a number of cases in support of the argument that the government infringed the attorney-client privilege.  However, because the government did not direct CCA to make the recordings, because the recordings are visual only, because (perhaps, most importantly) no employee of the U.S. Attorney's Office or law enforcement officer has reviewed any video recording of an attorney meeting with a client, and because the meetings may not have been privileged due to what was recorded or because of a waiver, the cases cited by the FPD are distinguishable from the instant facts.

In *Shillinger v. Haworth*, 70 F.3d 1132 (10th Cir. 1995), a deputy sheriff was physically present in the room while defense counsel met with his client. Defense counsel paid the deputy sheriff's overtime wages for his services, and allegedly instructed the deputy sheriff to consider himself an employee of defense counsel during the time of the trial preparation.  The deputy sheriff subsequently informed the prosecutor of the contents of communications between the defendant and his attorney, including a pretrial session during which counsel and defendant discussed the particulars of the defendant's anticipated testimony.

The Tenth Circuit held that where a prosecutor intentionally intrudes into the attorney client-relationship without a countervailing government interest, such an intrusion will constitute a per se violation of the Sixth Amendment.  The Tenth Circuit stated:

> This is not a case in which the state's interest in effective law enforcement is at issue.  Rather, this is a case in which the prosecutor, by his own admission, proceeded for the purpose of determining the substance of [defendant's] conversations with his attorney, and attorney-client communications were actually disclosed.  This sort of purposeful intrusion on the attorney-client relationship strikes at the center of the protections afforded by the Sixth Amendment and made applicable to the states through the Fourteenth Amendment.

*Shillinger*, 70 F.3d at 1141.

Here, it was CCA that independently made the visual recordings.  No prosecutor or law enforcement officer asked CCA to record the attorney-client meetings, and no prosecutor or law enforcement officer has reviewed any visual recording of any attorney-client meeting.  Further, the government did not intend to obtain the recordings of attorney-client meetings when issuing the subpoena to CCA.  There was no intentional intrusion.

The FPD also relies on *Case v. Andrews*, 226 Kan. 786 (Kan. 1978), was before the Kansas Supreme Court on a *habeas corpus* petition.  The Kansas Supreme Court entered a ruling directing a sheriff to "permit attorneys consulting clients held in the county jail to place their coats over the television camera lens during such a conference."  *Id.* at 791.  However, the state did not present justification or explanation for not allowing defense counsel to cover the camera lens.  "The respondent has offered us no sufficient justification for

the denial of the request.  The respondent has made no showing that the practice of denying such requests furthers any substantial governmental interest in security, order, or rehabilitation." *Id.* at 790.

In *State v. Sherwood*, 174 Vt. 27 (Vt. 2002) the Vermont Supreme Court affirmed a conviction where the state recorded, both *audibly and visually*, a telephone conversation between the defendant and counsel, unbeknownst to the defendant.  The Vermont Court affirmed the conviction, finding no prejudice because the state did not use the recordings against the defendant. The Vermont court did acknowledge that "[a]bsolute privacy is not required so that the police may address any security concerns arising from the interaction with the defendant." *Id.* at 30 (citation omitted).

In *Moore v. Janing*, 427 F.Supp. 567, (D. Neb. 1976), the District of Nebraska court dealt with conditions at an interim jail where there was no room for attorney-client visits and a government agent was present to eavesdrop or monitor telephone conversations between attorney and client. The Court ordered the state to submit a plan under which private facilities for visitation would be available.  Here, because it appears that the CCA recordings were visual only, and because no person on the prosecution team has viewed any attorney-client communication, the facts are distinguished.

*Mastrian v. McManus*, 554 F.2d 813, 820-21 (8th Cir. 1977), involved a claim in a habeas petition that the claimant's Sixth Amendment rights were violated when his conversations with counsel were monitored by another inmate.  The Eighth Circuit acknowledged, "that an accused does not enjoy the

effective aid of counsel if he is denied the right of private consultation." The Circuit also held, "Evidence that a party monitored the accused's conversations with his attorney does not necessarily establish a Sixth Amendment violation. Rather, the accused must show, in addition, that the substance of the overheard conversation was of some benefit to enforcement officials.  Absent this proof, a monitoring allegation must be denied."  *Id.* at 821. Here, the government has not monitored any protected attorney-client communications, let alone benefitted from them.

In *State v. Walker*, 804 N.W.2d 284 (Iowa 2011), and *People v. Dehmer*, 931 P.2d 460 (Colo. App. 1996), the Iowa and Colorado state courts each considered a statute that specifically granted an arrestee's right to "see and consult confidentially" with his attorney "alone and in private" (*Walker,* 804 N.W.2d at 294, quoting an Iowa statute) and "see or consult, alone and in private at the place of custody."  (*Dehmer*, 931 P.2d at 463 (quoting a Colorado statute)).  No similar federal statute has been identified.

*United States v. DiDomenico*, 78 F.3d 294, 299 (7th Cir. 2004), involved someone (an investigation was inconclusive on determining whom was responsible) making an audio tape recording of a defendant and his attorney, which is clearly not the situation in this case.

In *Al Oday v. United States*, 346 F.Supp.2d 1 (D.D.C. 2004), the District of Columbia considered the government's request, for reasons of national security, to conduct real-time monitoring of meetings between habeas petitioners who were detained at Guantanamo Bay Naval Base following the

September 11, 2001 terrorist attacks.  There, the government sought to monitor, visually and audibly, meetings between counsel and client, review attorney's notes taken during those meetings, and review legal mail between them.  The Court found that it had established a framework to protect both the government's national security interest while simultaneously protecting the client's Sixth Amendment rights, and therefore denied the government's request.

The facts of this case distinguish this matter from the cases cited by the FPD.  First, as noted earlier, the government did not ask CCA to record the attorney client meetings.  Rather, CCA made any visual recording as part of its internal policy.  Second, there is no indication that any meeting between an attorney and client was audibly recorded. Third, no prosecutor or investigative agent has viewed the video recordings from the attorney-client rooms.  Fourth, the government did not intend to obtain the video recordings in response to the issued subpoena.  Fifth, the government does not desire to view the video recording.

Therefore, in an effort to not unnecessarily expend court resources, the Government suggests the solution described below.

**II. The Special Master should be ordered to excise any video recordings of attorney-client rooms and retain the videos in the unlikely case they later become potentially exculpatory evidence or subsequent review is required.**

***A.  Role of Special Master***

As mentioned during the prior hearings, the parties agree that appointment of a Special Master may aid the Court with this pending issue

18

regarding the video recordings of attorney meeting rooms at CCA.  Federal Rule of Civil Procedure 53 explains the role of Special Masters.

(a) Appointment.

(1) Scope.  Unless a statute provides otherwise, a court may appoint a master only to:

(A) perform duties consented to by the parties;

(B) hold trial proceedings and make or recommend findings of fact on issues to be decided without a jury if appointment is warranted by:

(i) some exceptional condition; or

(ii) the need to perform an accounting or resolve a difficult computation of damages; or

(C) address pretrial and posttrial matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district.

(2) Disqualification. A master must not have a relationship to the parties, attorneys, action, or court that would require disqualification of a judge under 28 U.S.C. § 455, unless the parties, with the court's approval, consent to the appointment after the master discloses any potential grounds for disqualification.

(3) Possible Expense or Delay. In appointing a master, the court must consider the fairness of imposing the likely expenses on the parties and must protect against unreasonable expense or delay.

(b) Order Appointing a Master.

(1) Notice.  Before appointing a master, the court must give the parties notice and an opportunity to be heard.  Any party may suggest candidates for appointment.

(2) Contents.  The appointing order must direct the master to proceed with all reasonable diligence and must state:

(A) the master's duties, including any investigation or enforcement duties, and any limits on the master's authority under Rule 53(c);

(B) the circumstances, if any, in which the master may communicate ex parte with the court or a party;

(C) the nature of the materials to be preserved and filed as the record of the master's activities;

(D) the time limits, method of filing the record, other procedures, and standards for reviewing the master's orders, findings, and recommendations; and

(E) the basis, terms, and procedure for fixing the master's compensation under Rule 53(g).

(3) Issuing.  The court may issue the order only after:

(A) the master files an affidavit disclosing whether there is any ground for disqualification under 28 U.S.C. § 455; and

(B) if a ground is disclosed, the parties, with the court's approval, waive the disqualification.

(4) Amending.  The order may be amended at any time after notice to the parties and an opportunity to be heard.

(c) Master's Authority.

(1) In General.  Unless the appointing order directs otherwise, a master may:

(A) regulate all proceedings;

(B) take all appropriate measures to perform the assigned duties fairly and efficiently; and

(C) if conducting an evidentiary hearing, exercise the appointing court's power to compel, take, and record evidence.

(2) Sanctions.  The master may by order impose on a party any noncontempt sanction provided by Rule 37 or 45, and

may recommend a contempt sanction against a party and sanctions against a nonparty.

(d) Master's Orders.  A master who issues an order must file it and promptly serve a copy on each party.  The clerk must enter the order on the docket.

(e) Master's Reports.  A master must report to the court as required by the appointing order.  The master must file the report and promptly serve a copy on each party, unless the court orders otherwise.

(f) Action on the Master's Order, Report, or Recommendations.

(1) Opportunity for a Hearing; Action in General.  In acting on a master's order, report, or recommendations, the court must give the parties notice and an opportunity to be heard; may receive evidence; and may adopt or affirm, modify, wholly or partly reject or reverse, or resubmit to the master with instructions.

(2) Time to Object or Move to Adopt or Modify.  A party may file objections to--or a motion to adopt or modify--the master's order, report, or recommendations no later than 21 days after a copy is served, unless the court sets a different time.

(3) Reviewing Factual Findings.  The court must decide de novo all objections to findings of fact made or recommended by a master, unless the parties, with the court's approval, stipulate that:

(A) the findings will be reviewed for clear error; or

(B) the findings of a master appointed under Rule 53(a)(1)(A) or (C) will be final.

(4) Reviewing Legal Conclusions.  The court must decide de novo all objections to conclusions of law made or recommended by a master.

(5) Reviewing Procedural Matters.  Unless the appointing order establishes a different standard of review, the court may set aside a master's ruling on a procedural matter only for an abuse of discretion.

21

(g) Compensation.

    (1) Fixing Compensation.  Before or after judgment, the court must fix the master's compensation on the basis and terms stated in the appointing order, but the court may set a new basis and terms after giving notice and an opportunity to be heard.

    (2) Payment.  The compensation must be paid either:

        (A) by a party or parties; or

        (B) from a fund or subject matter of the action within the court's control.

    (3) Allocating Payment.  The court must allocate payment among the parties after considering the nature and amount of the controversy, the parties' means, and the extent to which any party is more responsible than other parties for the reference to a master.  An interim allocation may be amended to reflect a decision on the merits.

(h) Appointing a Magistrate Judge.  A magistrate judge is subject to this rule only when the order referring a matter to the magistrate judge states that the reference is made under this rule.

Fed. R. Civ. P. 53.

    The use of a Special Master is to aid the Court in performance of specific judicial duties and not to displace or replace the Court.  *See La Buy v. Howes Leather Company*, 352 U.S. 249, *reh. denied*, 352 U.S. 1019 (1957).  The decision to appoint a Special Master is within the discretion of the Court.  *See Bradshaw v. Thompson*, 454 F.2d 75 (6th Cir. 1972); *Wilver v. Fisher*, 387 F.2d 66 (10th Cir. 1967).  But referring fundamental issues of liability to a Special Master over the objection of a party is impermissible.  *See Stauble v. Warrob, Inc.*, 977 F.2d 690 (1st Cir. 1992).  Overall, the reference of issues to a Special Master should be

the exception.  *See Bartlett-Collins Co. v. Surinam Nav. Co.*, 381 F.2d 546
(10th Cir. 1967).

As noted by the FPD, the use of a Special Master is to aid the
Court in managing its litigation.  (*Defense Memorandum in Support of
Motion for Special Master*, doc. 106 at 2.)  The FPD characterizes the
potential litigation to be in multiple cases throughout the District.  (*Id.* at
5.)  However, that claim seems based on the mistaken belief that this
office engaged in Sixth Amendment violations of the defendants in this
case.  As noted above, there is no evidence that privileged
communications between attorneys and clients were video recorded that
would form the initial premise of this mistaken belief.  Furthermore,
assuming there were any such privileged communications video
recorded, no government attorney or agent have reviewed any such video,
so there has been no violation of the privilege.  Additionally, the FPD
provided no authority that an investigation of prosecutors should be
pursued through the use of a Special Master.

Because no prosecutor or agent has reviewed any of the video
recordings from the attorney meeting rooms, there is no "investigation"
needed by the FPD or a Special Master.  (*See id.* at 5.)  Therefore, the
scope of the Special Master envisioned by the FPD exceeds what is
necessary to resolve the critical issue in this case.  (*See Proposed Order
Appointing Special Master*, doc. 106-1 at 204.)  Of note, the FPD
separately identifies the scope of the Special Master with respect to this

specific case on page 4 of its proposed order, which makes it appear as though this case is being utilized for purposes other than the issues that are critical to the defendants in this case.[4]

Because there has been no Sixth Amendment violation by prosecutors or agents in this case, the critical issue to be resolved is how the defendants in this case are provided the discovery needed to represent themselves without them receiving potential attorney-client privileged communications that may be contained on the video recordings from the attorney meeting rooms. The past policies and practices at CCA or other detention facilities used by the United States Marshals Service are not relevant to the critical issue for these defendants. Rather, the laundry list of the scope of proposed duties by the FPD is akin to a "fishing expedition" without a good-faith basis to believe prosecutors ever sought such potential attorney-client privileged communications.

## B. Task of Special Master

As stated above, neither any prosecutor nor agent has viewed any of the CCA video from any of the attorney-client interview rooms. However, based upon the evidence known to the government at this point in the investigation (that no introduction of contraband or other illegal conduct occurred in the attorney-client interview rooms, whether by inmates, guards, or other visitors

---

[4] By expanding the scope of the Special Master as proposed by the FPD, does that not create needless issues for the defendants in this case, especially because the FPD has a direct conflict in this case as that office would represent several witnesses at a trial in this case.

using the room), the United States would propose to forgo review of any video recordings from those rooms. To conserve taxpayers' and the court's limited financial resources and reduce the need for the Special Master, and in recognition of the sensitive nature of the videos, the government would agree not to seek the return of any video recorded in the attorney-client visitation rooms, subject to the caveats discussed below. The United States would further agree not to seek to obtain any such video without first filing a motion with the Court asking that the Special Master be assigned at that time to review the requested attorney-client video for privileged communications.

The Special Master should be instructed to maintain and not destroy the video from the attorney-client rooms for three reasons. First, as the investigation is ongoing, there exists the possibility that the evidence could prove to be exculpatory evidence to some defendant or target at some future time. For instance, if allegations arise that on a certain date at a certain time an inmate distributed contraband, the inmate might claim that at that time the inmate was visiting an attorney. The video, therefore, might constitute exculpatory evidence that would need to be provided to that particular defendant.

On the other hand, at some future point in time, this on-going investigation might reveal conduct that occurred in an attorney-client room at a certain time. If this situation arises, the United States should be allowed to ask the Special Master to review that particular footage to determine whether

any privileged attorney-client communication occurred, and if so, whether an exception (such as the crime-fraud exception) applies.

Finally, the FPD has alleged potential Constitutional violations and implies that sanctions may be appropriate. Unless the videos are, after proper review and consideration of applicable law concerning privilege, determined in law and in fact to be privileged material, there should be no further consideration of alleged Constitutional violations. However, should defense counsel persist in these allegations, the videos should be retained for review as needed in helping the Court resolve such allegations.

The excising of the attorney-client rooms video by the Special Master needs to be conducted in a manner that preserves the remainder of the video so that the video can properly be reviewed by the parties and, if necessary, introduced at trial or other hearing. Therefore, as discussed below, the United States respectfully suggests that the Court retain a computer expert to assist the Special Master in excising the attorney-client rooms video from the remainder of the video so as to maintain the integrity of the remaining video.

### III. The Special Master should be assigned a computer expert to assist in the excising of the attorney-client room video

The government considers this role as that of a computer forensic expert, who could image the CCA drive containing the attorney-client rooms video without duplicating the video from those rooms onto the newly-created drives that would be provided to the government and counsel for the defendants in this case and counsel for other targets of this investigation. Specifically, this

computer forensic expert would utilize software tools to verify the image is an exact duplicate of the data except the attorney-client rooms video.

**IV.  The remaining video should be returned to the United States immediately so that it can continue its investigation.**

The Court should instruct the Special Master that, after the Special Master verifies that no attorney-client room video is contained on a particular hard-drive, or any such video is excised, the drive should be returned to the United States so that it can provide the video in discovery and continue its investigation.

**V.  This proposal should not be construed as an acknowledgment of any wrongdoing by the United States.[5]**

As discussed above, the government did not ask CCA to record the attorney-client room and no agent or prosecutor viewed any video of an attorney-client meeting.  The United States has not violated the defendants' Sixth Amendment rights and any suggestion to the contrary is legally and factually incorrect.  Rather, the United States' proposal reflects an effort by the United States to resolve this sensitive matter in a reasonable, responsible, and expeditious manner.[6]

**VI.  There is nothing for the Special Master to do as it relates to the recorded telephone calls.**

---

[5] This caveat is necessary because the FPD's memorandum (Doc. 106), motion (Doc. 85) and statements in court suggests that Constitutional violations have occurred and that sanctions may be appropriate.

[6] The United States may have additional suggestions for the Special Master once the facts are known and developed with respect to the recording of telephone calls by CCA.  The government will file a separate response to the FPD's motion (Doc. 105) related to the phone calls.

The government will file a response to the FPD's motion related to the CCA recorded telephone calls.  As discussed in that response, the calls are not privileged.  Therefore, there is no need to employ a Special Master with regard to the recorded telephone calls.

Respectfully submitted,

THOMAS E. BEALL
Acting United States Attorney

s/ *Debra Barnett*
Debra Barnett
Assistant United States Attorney
1200 Epic Center
301 N. Main
Wichita, KS  67202-4812
(316) 269-6481 (telephone)
(316) 268-6484 (facsimile)

/s/*Erin S. Tomasic*
Erin S. Tomasic
Special Assistant U.S. Attorney
District of Kansas
500 State Avenue, Suite 360
Kansas City, Kansas  66101
(913) 551-6730 (telephone)
(913) 551-6541 (facsimile)
D. Kan. No. 78430

s/ D. Christopher Oakley
D. Christopher Oakley, 19248
Assistant United States Attorney
500 State Avenue; Suite 360
Kansas City, Kansas 66101
Telephone: 913-551-6730
Facsimile: 913-551-6541
E-mail: chris.oakley@usdoj.gov
Attorneys for Plaintiff

**Certificate of Service**

I hereby certify that on the 23rd day of August, 2016, the foregoing was electronically filed with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to all counsel.

s/ D. Christopher Oakley
Assistant United States Attorney