# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | **Case No. 16-CR-20032-JAR** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Government's Response to Federal** |
| | ) | **Public Defender's "Motion to Show** |
| **LORENZO BLACK,** | ) | **Cause" re Contempt; Memorandum** |
| **KARL CARTER,** | ) | **of Points and Authorities; Exhibit** |
| **ANTHON AIONO,** | ) | |
| **ALICIA TACKETT, and** | ) | |
| **CATHERINE ROWLETTE,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

The United States of America, by and through its counsel of record, Assistant United States Attorney Steven Clymer, appointed as Special Attorney pursuant to 28 U.S.C. § 515 to represent the United States in connection with Phase III of the special master Investigation, hereby responds to and opposes the Federal Public Defender's "Motion to Show Cause" for an order requiring the government to show cause why it should not be held in contempt of court based on the government's September 12, 2017 letter response to the special master. This response is based on the files and records of this case and the attached memorandum of points and authorities and

exhibit, and is filed pursuant to this Court's text order dated November 13, 2017, permitting the

parties to file responses by December 22, 2017.  [#310].

.          .                              Respectfully submitted,

                                          Steven D. Clymer
                                          Special Attorney for the United States

## MEMORANDUM OF POINTS AND AUTHORITIES

## I

## Introduction

On October 25, 2017, the Office of the Federal Public Defender for the District of Kansas moved this Court "to Order the government to show cause why it should not be held in contempt of court and sanctioned for its refusal to cooperate with the special master in a faithful and timely manner," based on the government's September 12, 2017 letter response to requests from the court-appointed special master.  Although not entirely clear from the motion, it appears that the Federal Public Defender ultimately seeks an order from this Court holding the United States Attorney's Office for the District of Kansas ["USAO"] in contempt.  There is no basis in law or fact for the Federal Public Defender's motion and it would be improper as a matter of law for this Court to hold any government official in contempt based on the response to the special master. The Court should deny the motion for at least three reasons:

First, the Office of the Federal Public Defender is not a party to this criminal case and does not represent any defendant who is a party.  As a result, the Federal Public Defender's Office has not and cannot establish that it has standing to seek redress in any form in this case.[1]  Article III of the United States Constitution provides no jurisdictional basis for this Court to grant the Federal Public Defender's request.

Second, to the extent the Court is inclined to issue a show cause order or impose a contempt sanction *sua sponte*, it would be erroneous for it to conclude, as the Federal Public Defender's motion suggests, that *the USAO* disobeyed an order of this Court.  As the record makes clear,

---

[1] No defendant in this case has joined the Federal Public Defender's Motion for an order to show cause.

authority to respond to the special master is vested in Assistant United States Attorney ["AUSA"] Steven D. Clymer pursuant to 28 U.S.C. § 515 as a "Special Attorney."  Special Attorney Clymer, not the USAO, responded to the special master in the September 12, 2017 letter.

Third, it would be error for this Court to issue an order to show cause or hold Special Attorney Clymer in contempt for the letter response to the special master.  Although not mentioned in the Federal Public Defender's motion, the government's September 12, 2017 letter to the special master explains that the response is dictated by application of the "*Touhy* regulations" of the Department of Justice ["DOJ"], 28 C.F.R. § 16,21 *et seq.*  It is well established that it would be improper for a federal district court to hold a DOJ employee in contempt of court for the employee's compliance with the *Touhy* regulations, even if the court disagrees with the employee's analysis.

## II

## Background

### A.    Charges Against the Named Defendants, Appointment of Counsel, and Dispositions

On April 9, 2016, the government filed a criminal complaint naming Lorenzo Black, Karl Carter, Anthon Aino, Alicia Tackett, Catherine Rowlette, David Bishop, and one other person with various federal offenses arising from an investigation of contraband smuggling into a detention facility in Leavenworth, Kansas, operated by a company then known as known as "Correction Corporations of America" ["CCA Leavenworth"] [#1].  On April 11, 2016, the following attorneys were appointed under the Criminal Justice Act to represented the following defendants: David J. Guastello was appointed to represent defendant Carter [#15]; Michael M. Jackson was appointed to represent defendant Catherine Rowlette [#28]; John Jenab was appointed to represent defendant Black [#12]; Jason P. Hoffman was appointed to represent defendant Aiono [#21]; Kathleen A.

Ambrosio was appointed to represent defendant Tackett [#24]; and Cynthia M. Dodge was appointed to represent defendant Bishop [#32].

On May 4, 2016, a federal grand jury in the District of Kansas returned an indictment charging Black, Carter, Aino, Tackett, Catherine Rowlette, and Bishop with various federal offenses, including, as to some or all of the defendants, conspiracy to distribute and possess with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) & 846; multiple counts of contraband smuggling, attempted contraband smuggling, aiding and abetting contraband smuggling into a federal detention facility, and possession and attempted possession of such contraband, in violation of 18 U.S.C. §1791(a)(1), (b)(1), (b)(5), and 2; payment and receipt of a bribe, and aiding and abetting such conduct, in violation of 18 U.S.C. §§ 666(a)(1)(B) and (a)(2) and 2; conspiracy to commit concealment money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and (h); and identity theft, in violation of  18 U.S.C. §§ 1028(a)(7), (b)(3)(A), and 2 [#52].

On November 3, 2016, defendant Catherine Rowlette entered a guilty plea.  [#168, #169, #171].  Rowlette was sentenced on March 15, 2017 [#211], and judgment was entered against her the same day. [#212].  On March 13, 2017, defendant Tackett entered a guilty plea.  [#205, #206].  Tackett was sentenced on May 30, 2017 [#261], and judgment was entered on May 31, 2017.  [#264].  On March 13, 2017, defendant Black entered a guilty plea.  [#209].  On March 16, 2017, the grand jury returned a superseding indictment as to defendants Carter, Aiono, and Bishop.  [#213].  On April 5, 2017, defendant Aiono entered a guilty plea.  [#233, #234].

The Federal Public Defender's Office it not a party to this case and has not at any time represented any defendant in this case.

**B.      The Special Master's Appointment and Reports**

On October 11, 2016, the Court appointed a special master pursuant to Fed. R. Civ. P. 53 to investigate defense allegations that, during the investigation at CCA Leavenworth, the government violated the attorney-client privilege and the Sixth Amendment right to counsel. [#146].[2]  This "Appointment Order" described an initial set of duties for the special master during "Phase I" of his investigation, *id*. at pp. 4-5, and additional duties during "Phase II."  *Id*. at p.5. The Appointment Order also set out certain "Complementary Duties", *id*. at p. 6, and "Additional, Investigative Duties."  *Id*. at pp. 7-8.

The Appointment Order provides that the "relevant parties," which include "the Government" and "the United States Attorney's Office," "shall all provide full cooperation to the Special Master, and any staff or consultant employed by the Special Master, and observe faithfully the requirements of any orders of the Court and rulings by the Special Master."  #146 at p. 13 & n.13.  It further provides that these parties "will make readily available to the Special Master any and all individuals, information, documents, materials, programs, files, databases, services, facilities, and premises under their control that the Special Master requires to perform his duties" and "to fulfill the Special Master's functions under this Order."  *Id*. at p. 14.  Citing Fed. R. Civ. P. 53(c)(2), the Appointment Order empowers the special master to recommend a contempt sanction against any party or nonparty for refusing to cooperate.  #146 at p. 13.

In a minute order issued on November 16, 2016, this Court ordered that the special master proceed with Phase II of the investigation.  [#179].

---

[2] The allegations pertain to video recordings of inmate-attorney meetings in CCA Leavenworth interview rooms and audio recordings of outgoing CCA inmate telephone calls to attorneys.

Between November 14, 2016, and March 16, 2017, the special master issued a series of reports [#176, # 177, #183, #184, #186, #187, #193, #214]. Among other things, the special master reports describe evidence concerning soundless video recordings of meetings between inmates and attorneys at CCA-Leavenworth and the audio recording of outgoing inmate telephone calls from the facility to attorneys. These reports do not describe any evidence of violations of the attorney-client privilege or the Sixth Amendment right to counsel and do not conclude or opine that any such violations have occurred.

## C.    The Phase III Order

On May 17, 2017, this Court issued an order entitled "Memorandum and Order Directing Phase III Investigation" ["the Phase III order"] [#253]. The Court made clear that that it was "not rul[ing] in this Order upon the issues of privilege, waiver, and Sixth Amendment violations," *id.* at p. 16, but nonetheless directed the special master "to investigate the actions and conduct of the government, the USAO attorneys and staff, and the participating investigative agencies . . . in procuring, obtaining and perhaps using video and audio recordings of attorney-client meetings and phone calls at CCA." *Id.* at pp. 5-6.

The Phase III order reiterated that "relevant parties" were required to cooperate with the special master and provide him with access to information. *Id.* at p. 7.

## D.    The Hearing in *United States v. Dertinger*

On June 20 and 21, 2017, this Court conducted an evidentiary hearing in *United States v. Dertinger*, 14-CR-20067-JAR. Richard Dertinger alleged government violations of his Sixth Amendment right to counsel and attorney-client privilege, including by the government's viewing and use of a soundless video of a meeting that he had with his previous legal counsel while Dertinger was an inmate at CCA. During this hearing, witnesses testified about events discussed

in this Court's Phase III order.  #253 pp. 24-25, 33-38.  The Court permitted the special master to question these witnesses.

E.      **The Special Master's July 10, 2017 Letter Request to United States Attorney Beall**

On July 10, 2017, as part of the Phase III investigation, the special master requested 14 categories of information from the USAO in a letter addressed to United States Attorney Thomas Beall.  [#298-7; Exhibit G to the special master's report dated October 20, 2017, discussed at #298 at p. 5].  In addition, the special master communicated with officials from the USAO about certain proposed word searches through its computer servers for relevant documents and the production to the special master of the results of those searches.  [#298 at pp. 2-3].  Collectively, these requests for information will be referred to as the "RFI."

F.      **The July 14, 2017 Letter from EOUSA General Counsel Jay Macklin to the Court**

In a July 14, 2017 letter to the Court, Jay Macklin, General Counsel for the Executive Office of United States Attorneys, United States Department of Justice ["EOUSA"], explained that AUSA Steven D. Clymer, Northern District of New York, had been appointed under 28 U.S.C. § 515 "to take overall responsibility for, and control of, the [Justice] Department's participation in Phase III of the Investigation."  The letter also explained that AUSA Clymer "will have full authority for making any necessary decisions on responses to requests from you or the Special Master related to Phase III of the Investigation."  [#298-5; Exhibit E to the special master's report dated October 20, 2017].

G.      **The September 12, 2017 Letter Response to the Special Mater's RFI**

Consistent with the Macklin letter, on September 12, 2017, AUSA Clymer responded to the special master's RFI in a letter.  [#298-9; Exhibit I to the special master's Report dated October

25, 2017].[3]  Because the Federal Public Defender's motion argues that this letter response was contemptuous and, in doing so, appears to misunderstand the response (as explained below), this September 12, 2017 letter is described in some detail here.

1.    **Introduction and the DOJ *Touhy* Regulations**

At the outset, the letter response reiterates the information in the Macklin letter concerning the appointment of AUSA Clymer as a "Special Attorney" under 28 U.S.C. § 515.  The letter also explains that, because the special master's RFI requested "production or disclosure of . . . material contained in the files of the Department [of Justice] . . . information relating to material contained in the files of the Department, [and] information acquired by [persons] while [employed by] the Department as a part of the performance of [their] official duties or because of [their] official status," (quoting 28 C.F.R. § 16.21(a)), AUSA Clymer's response to the RFI was "governed by the so-called '*Touhy* regulations,' located at 28 C.F.R. §§ 16.21 through 16.29."  Exhibit #1 at p. 2.  The letter response then describes these regulations and explains that they require DOJ employees to consider certain factors set out in the regulations when deciding whether disclosure is appropriate.  *Id.* at pp. 2-3.

The letter response identifies the following relevant factors that, under the *Touhy* regulations, must be considered: (a) the governing Federal Rules of Criminal Procedure, specifically Fed. R. 16(a)(1), which governs the government's discovery obligations, and 26.2, which governs disclosure of witness statements; (b) applicable privileges, including the law enforcement privilege, the deliberative process privilege, the work-product doctrine, and the attorney-client privilege; (c) the grand jury secrecy obligation set out in Fed. R. Crim. P 6(e);

---

[3] For the Court's convenience, a copy of the government's September 12, 2017 letter response to the special master is attached as Exhibit #1.

(d) the Privacy Act of 1974, codified at 5 U.S.C. § 552a; and (e) a provision in 28 C.F.R. § 16.26(b)(5) safeguarding law enforcement sensitive information.  The letter response describes each of these factors, including citations to controlling legal authority.  Exhibit #1 at pp. 5-7.

The letter response then explains that the RFI requests information and documents outside the scope of the applicable Federal Rules of Criminal Procedure, and that a leading Supreme Court decision, *United States v. Armstrong*, 517 U.S. 456 (1996), establishes that a criminal defendant requesting discovery of information from the government to support a claim of government violations of the Fifth Amendment equal protection clause must first make a substantial preliminary showing of such violations.  Exhibit #1 at pp. 7-10.

### 2.    Discussion of the Record

The letter response next discusses the "record," which it identifies as "publicly-filed documents in the *Black* case, including [special master's] reports and transcripts of three court hearings, the transcript of a hearing in *United States v. Dertinger*, Case No. 14-CR-20067, on June 20-21, 2017 . . . and various filings in *Dertinger* and other cases in the District of Kansas."  The letter response then sets out a number of detailed assertions, each supported by citations to the record.  Among other things, the letter explains that:

- "there is no evidence of any Sixth Amendment right-to-counsel violations arising from the investigation at the CCA-Leavenworth detention facility ["CCA"] that resulted in the charges in *United States v. Black*."  Exhibit #1 at p. 10.

- "there is no evidence that any defendant indicted in the *Black* case suffered a violation of his or her Sixth Amendment right to counsel or infringement of his or her attorney-client privilege."  *Id*.

- "There is no evidence that the recording at CCA of either soundless video of attorney-inmate meetings or outgoing inmate telephone calls to attorneys was conducted at the direction of the USAO."  *Id*. at p. 11 (emphasis omitted).

With respect to the video recordings of the inmate-attorney meetings at CCA Leavenworth, the letter response further explains that:

- "there is no evidence that it was the intent of [SAUSA] Tomasic, any USAO employee, or any law enforcement official to obtain video of CCA attorney-inmate meetings by use of subpoena or other means."  *Id*. at p. 11 (emphasis omitted).

- "Even before . . . testimony at the hearing in *Dertinger* [showed that "it is almost certain that no USAO employee or law enforcement official viewed any CCA video of an attorney-inmate meeting"], the special master already "had 'tentatively' concluded that '(1) neither the OUSA nor any law enforcement officer actually viewed any of the video-recorded attorney-client meetings that were seized [sic] from CCA-Leavenworth in May of 2016; and (2) neither the OUSA nor any law enforcement officer have ever before obtained (much less actually viewed) video-recordings of attorney-client meetings at CCA-Leavenworth.'"  *Id*. at p. 12-13 (emphasis omitted).

- "Even had a government official viewed the video of an attorney-inmate meeting at CCA, soundless video of an attorney-inmate meeting cannot, standing alone, reveal attorney-client privileged information unless a participant is using sign language or the viewer can read lips."  *Id*. at p. 13 (emphasis omitted).

- "the district court [in the Phase III order] properly refrained from finding that the soundless video of the Rokusek-Dertinger meeting revealed attorney-client privileged information or that any soundless video could, standing alone without accompanying verbal or written

context or a later description by a participant, be privileged." *Id*. at p. 13 (emphasis omitted).

With respect to the audio recordings of outgoing CCA Leavenworth inmate telephone calls to attorneys, the letter further explains that:

- "There is no evidence that it was the specific intent of any USAO employee or any law enforcement official involved in the *Black* investigation to obtain recordings of CCA attorney-inmate telephone calls by use of subpoena or other means." *Id*. at p. 14 (emphasis omitted).

- "There is strong, perhaps unanimous consensus among federal courts that participants in telephone calls made under [the] circumstances [present at CCA Leavenworth − multiple written warnings to inmates, included posted signs near and on the telephones, and an audible warning to both inmates and telephone call recipients that all calls were recorded unless subject to a process by which attorney telephone numbers could be designated as 'private' −] have no reasonable expectation of privacy and that any privilege that otherwise might apply to the content of the call is waived." *Id*. at p. 14 (emphasis omitted).

The letter response also explains that:

> Even if, contrary to all of the evidence and legal authority described above, it somehow was the case that (a) some or all the soundless videos of CCA inmate-attorney meetings reveals attorney-client privileged information; (b) CCA outgoing inmate telephone calls to attorneys are protected by the attorney-client privilege despite the warnings at CCA about the monitoring and recording of those calls; (c) USAO employees and law enforcement officials purposefully and knowingly obtained video of attorney-inmate meetings and audio files of outgoing inmate telephone calls to attorneys from CCA; and (d) USAO employees viewed those videos and listened to those audio files and used what they saw and heard to the detriment of the interceptees (none of which has been proven), *the record remains devoid of evidence that any defendant named in the Black case suffered a violation of his or her Sixth Amendment right to counsel*.  Indeed, as noted above, of the *Black* defendants, only Karl Carter was an inmate at CCA during the

investigation and he has not alleged, much less established, any violation of
his attorney-client privilege or Sixth Amendment rights.

*Id*. at p. 17 (emphasis in original).

The letter response acknowledges that the special master, through his investigation, might
be aware of evidence unknown to AUSA Clymer and welcomes from the special master
identification of errors or material omissions in its discussion of the record (as excerpted above):
"If you believe that any of the preceding or following assertions are inaccurate or incomplete, or
there is material information that I have not but should consider, please let me know." Exhibit #1
at pp. 10-11 (emphasis omitted). The special master has not identified any inaccuracies or
omissions in this discussion of the record evidence.[4] Neither has any defendant in this case or the
Federal Public Defender.

### 3.      Response to Each Category of Information in the RFI

The letter response then addresses the requests in the RFI, explains AUSA Clymer's
analysis of the requests under the DOJ *Touhy* regulations and, with respect to most, but not all of
the requests, informs the special master that AUSA Clymer is respectfully declining to provide the
requested information and documents. In doing so, the letter relies on the law governing each
relevant *Touhy* factor and the record evidence, as described above and in the letter request. Exhibit
#1 at pp. 17-22. The letter agrees to provide some materials to the special master, *id*. at p. 21,[5]
and offers to discuss other requests with the special master. *See, e.g.*, *id*. at p. 22.

---

[4] On December 18, 2017, defendant Carter filed a motion to dismiss alleging violations of his Fifth
and Sixth Amendment rights.

[5] The government has since provided this information to the special master.

### 4.    Separation of Powers Concerns

The letter response also describes legal authority establishing that judicial inquiries into the operation of a United States Attorney's Office raises separation of powers concerns.  The letter concludes by explaining that:

> Although the district court has authority to remedy any constitutional, statutory, or rule-based violations that are proven to have occurred in this criminal case, it lacks authority to investigate and supervise the internal operations and decisions of the United States Attorney's Office. My response to your requests therefore is not only required by the *Touhy* regulations and the substantive law that they command me to consider, it is consistent with constitutional limits on a district court's authority to demand information from a co-equal branch of government.

Exhibit #1 at p. 24.

## H.    The Special Master's October 20, 2017 Report

On October 20, 2017, the special master filed a report entitled "First Status Report Regarding Phase III Investigation," describing, among other things, the government's response to the RFI.  [#298].[6]  Significantly, the special master did not identify any errors in the discussion of the facts and governing law in the letter response.  *See* #298 at p. 8 ("From the Special Master's perspective, that the OUSA *may* have valid bases upon which to refuse production of information . . . .") (emphasis in original).  In addition, the special master did not recommend that the Court order the government to show cause or issue a contempt citation.

---

[6] As described in the government's previously-filed brief concerning this special master's October 20, 2017 report [#306], this report is not entirely accurate.

# III

# Argument

**A.    The Federal Public Defender Lacks Standing to Request Any Relief in This Case.**

**1.    Governing Law**

"No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26, 37–38 (1976). "The concept of standing is part of this limitation." *Id.* The standing doctrine "focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated." *Flast v. Cohen*, 392 U.S. 83, 99 (1968). As the Supreme Court has explained:

> Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const., Art. III, § 2. The doctrine of standing gives meaning to these constitutional limits by "identify[ing] those disputes which are appropriately resolved through the judicial process." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). To establish Article III standing, a plaintiff must show (1) an "injury in fact," (2) a sufficient "causal connection between the injury and the conduct complained of," and (3) a "likel[ihood]" that the injury "will be redressed by a favorable decision." *Lujan*, *supra*, at 560–561 (internal quotation marks omitted).

*Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (footnote omitted).

"The [Supreme] Court's . . . decisions consistently hold that a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) (citing *Younger v. Harris*, 401 U.S. 37, 42 (1971); *Bailey v. Patterson*, 369 U.S. 31, 33 (1962); *Poe v. Ullman*, 367 U.S. 497, 501 (1961).

The text of the Sixth Amendment establishes that only an "accused" defendant in a "criminal prosecution" has standing to seek judicial relief for an alleged violation of his or her constitutional right to counsel: "In all criminal prosecutions, the accused shall enjoy the right to . . . to have the Assistance of Counsel for his defence." U.S. Const. Amend. VI. Accordingly, the Supreme Court has explained that "[t]he Sixth Amendment right to counsel is personal to the defendant and specific to the offense." *Texas v. Cobb*, 532 U.S. 162, 172 (2001*); see also United States v. Jones*, 44 F.3d 860, 873 (10th Cir. 1995) ("The Sixth Amendment right to counsel is a personal right."). "A defendant thus does not have standing to raise the Sixth Amendment claims of a co-defendant." *Jones*, 44 F.3d at 873; *see also United States v. Davis*, 612 F. App'x 526, 527 (10th Cir. 2015) (unpublished) ("Defendant has no 'standing' to assert a violation of Calhoun's Sixth Amendment right to counsel or Fifth Amendment guarantee against self-incrimination."); *United States v. Adams*, 977 F.2d 596 (10th Cir. 1992) (unpublished) ("The government also argues . . . that the Sixth Amendment right to counsel is a personal right and a co-defendant lacks standing to challenge a violation. We agree."); *United States v. Arthur*, 582 F.3d 713, 720 (7th Cir. 2009) ("Ronald has no standing to raise a Sixth Amendment ineffective assistance of counsel claim on behalf of his wife); *United States v. Sims*, 845 F.2d 1564, 1568 (11th Cir. 1988) ("Even if the agents' actions violated Olsen's right to counsel, Sims has no standing to assert this claim.").[7]

---

[7]  The Federal Public Defender's Office has no attorney-client privilege of its own to assert in this case. The attorney-client privilege belongs to the client, not the attorney. *State v. Maxwell*, 10 Kan. App. 2d 62, 64, 691 P.2d 1316, 1320 (1984) ("The privilege belongs to the client."); Kan. Stat. Ann. § 60-426(a) ("communications found by the judge to have been between an attorney and such attorney's client in the course of that relationship and in professional confidence, are privileged, and a client has a privilege").

2.      **Discussion**

The Federal Public Defender's Office has no standing to seek relief in this criminal case. It is not an accused defendant and does not represent any person who is.  Thus, it has not and cannot establish that it or any client whom it represents has suffered an injury in fact caused by a Sixth Amendment violation that this Court can remedy in this case.[8]

The Federal Public Defender's Office may respond by contending that the government violated the Sixth Amendment rights of one or more of its clients who were housed at CCA Leavenworth during the investigation and/or prosecution of this case and that it must assert these rights here to protect these clients. Such an argument would be frivolous.[9]  First, in the sixteen months since the Federal Public Defender's Office first made in-court allegations that the government was intruding on the attorney-client privilege of CCA inmates and thereby violating the Sixth Amendment right to counsel, it has not identified in this litigation a single client for whom it has evidence of such a violation.  Second, if there is indeed a defendant represented by the Federal Public Defender's Office who has a viable Sixth Amendment claim arising from the

---

[8] To the knowledge of government counsel, since the appointment of the special master, none of the defendants who are named in the superseding indictment in this case have made a motion related to any phase of the special master's investigation and have not responded or objected to any of the many reports that the special master issued.  The only entity other than the government involved in the litigation concerning the special master's investigation is the Office of the Federal Public Defender.

[9] It also would be frivolous to contend that the government has somehow waived this jurisdictional standing claim by not asserting it previously.  *See, e.g.*, *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 851 (1986) ("When . . . Article III limitations are at issue, notions of consent and waiver cannot be dispositive because the limitations serve institutional interests that the parties cannot be expected to protect."); *Fed. Deposit Ins. Corp. v. Bachman*, 894 F.2d 1233, 1236 (10th Cir. 1990) ("standing may implicate the Article III requirement of a 'case or controversy,' an issue of subject matter jurisdiction which cannot be waived").

CCA Leavenworth investigation, he or she can assert that right in the criminal case in which he or she is named as a defendant.[10]

**B.**      **The Federal Public Defender's "Motion to Show Cause" Erroneously Identifies the United States Attorney's Office as Responsible for the Government's Response to the Special Master.**

The Federal Public Defender's motion "asks this Court to Order the government to show cause why it should not be held in contempt of court and sanctioned for its refusal to cooperate with the special master in a faithful and timely manner." [#301 at p.1].  It attributes to the *United States Attorney's Office* the conduct it alleges to be contemptuous: "The burden now shifts to the USAO to show cause why its non-compliance with this Court's lawful Orders should be excused.[11]

*Id*. at p. 8.

---

[10]  The Sixth Amendment attaches only upon initiation of formal criminal proceedings.  *United States v. Williston*, 862 F.3d 1023, 1034 (10th Cir. 2017).

[11]  The Federal Public Defender's motion is ambiguous about the allegedly contemptuous conduct, specifically whether the government's decision to produce only some of the documents and information that the special master requested was the only conduct meriting judicial sanction or, instead, whether the inadvertent erasure of a computer hard drive also constitutes contempt of court.  The motion also lists other alleged misdeeds by the government, creating additional uncertainty about the specific conduct for which it seeks to have the government show cause.  In addition, the motion is vague as to whether the Federal Public Defender's Office seeks civil or criminal contempt sanctions.  #301 at p. 7.  (The motion cites Fed. R. Civ. P. 37, which addresses discovery disputes in civil lawsuits, and 45, which pertains to subpoenas in civil lawsuits, but does not explain why these rules apply in this criminal case.)  Either form of contempt is problematic with respect to the erasure of the computer hard drive.  Civil contempt is used to enforce compliance with a court order, *see, e.g., Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1438, 1442 (10th Cir. 1998), but a civil sanction would be ineffective with respect to the computer hard drive.  One cannot be compelled to do the impossible, and restoring an erased computer hard drive is not possible.  Criminal contempt involves prosecution of a "person," not the government, *see* Fed. R. Crim. P. 42, and the government typically serves as prosecutor in criminal contempt proceedings.  *Id*. at (a)(2).  The Federal Public Defender's Office has not identified any government employee it believes to be responsible for the hard drive erasure and has offered no evidence that the erasure was willful, a further requirement for criminal contempt.  *Yates v. United States*, 316 F.2d 718, 723 (10th Cir. 1963) ("We, of course, recognize that knowledge or notice of the order in question on the part of appellant and a willful disobedience of that order are essential elements of criminal contempt.") (footnotes omitted).  Because of these unaddressed flaws with any claim

The Federal Public Defender's motion erroneously attributes the allegedly contumacious conduct to the USAO.  In fact, the response to the special master was from Special Attorney Clymer.  As described above, EOUSA General Counsel Jay Macklin's July 14, 2017 letter to the Court explained that AUSA Clymer had been appointed as a DOJ Special Attorney "under 28 U.S.C. § 515 to take overall responsibility for, and control of, the Department's participation in Phase III of the Investigation" and was given "full authority for making any necessary decisions on responses to requests from you or the Special Master related to Phase III of the Investigation." The September 12, 2017 letter response to the special master is from DOJ Special Attorney Clymer, not the United States Attorney's Office for the District of Kansas.[12]

**C.     It Would Be Erroneous as a Matter of Law to Hold Special Attorney Clymer in Contempt of Court for His Application of the *Touhy* Regulations, Even if the Court Disagrees with His Analysis.**

**1.     Governing Law**

It is well-established that the DOJ *Touhy* regulations are valid. *See, e.g., United States ex rel. Touhy v. Ragen*, 340 U.S. 462, 467-68 (1951) (holding that an FBI agent who refused to produce subpoenaed documents could not be held in contempt because he relied on a regulation that was a valid exercise of Executive authority under a housekeeping statute); *United States v. Allen*, 554 F.2d 398, 406 (10th Cir. 1977) ("We feel that the regulation controlling such disclosures

---

that a civil or criminal contempt sanction is an appropriate response to the erasure, this responsive pleading will assume that the Federal Public Defender's contempt motion is limited to the government's letter response to the special master.

[12]  The Federal Public Defender confuses the positions of "Special Assistant United States Attorney" ["SAUSA"] with "Special Attorney."  *See* Motion for OSC [#301] at p. 3 (mistakenly referring to AUSA Clymer as "a Special Assistant U.S. Attorney from another district").  These positions differ in a significant way. SAUSAs are appointed under 28 U.S.C. § 543 to assist United States Attorneys; Special Attorneys are appointed under 28 U.S.C. § 515 to assist the United States Attorney General.  As relevant here, in his role as a "Special Attorney," AUSA Clymer is not appointed to assist the United States Attorney and does not answer to District of Kansas United States Attorney Thomas Beall.

by Department of Justice employees is valid."). "Such regulations have the force of law." *Haithcox v. GEO Grp., Inc*., No. 07-CV-0160, 2008 WL 2487913, at *1 (D. Colo. June 16, 2008) (citing *Swett v. Schenk*, 792 F.2d 1447, 1451 (9th Cir.1986)).

It also is clear that these regulations apply broadly to requests for internal DOJ documents and information and that DOJ employees *must* follow them. *See* 28 C.F.R. § 16.21(a) ("This subpart sets forth procedures to be followed with respect to the production or disclosure of any material contained in the files of the Department, any information relating to material contained in the files of the Department, or any information acquired by any person while such person was an employee of the Department as a part of the performance of that person's official duties or because of that person's official status . . . [i]n all federal and state proceedings in which the United States is a party."); s*ee also State of Kan. v. Call*, 961 F.2d 220 (10th Cir. 1992) (describing "the regulations that establish the procedures with which federal officials and their superiors must comply") (unpublished).

The DOJ *Touhy* regulations apply without regard to whether a request or demand originates from a court, a criminal defendant, or another source, and apply even if a district court orders *in camera* disclosure. *In re Boeh*, 25 F.3d 761, 766-67 (9th Cir. 1994) ("*Touhy*'s point that the department head is entitled to enforce centralized decisionmaking applies without regard to the setting in which the information will be divulged."); *see also* 28 C.F.R. § 16.21(a)(1) (requiring that the *Touhy* procedures be followed "[i]n *all* federal and state proceedings in which the United States is a party") (emphasis added).

When a demand for documents or information is made in a case in which the United States is a party, as here, the DOJ *Touhy* regulations provide that the DOJ attorney in charge of the case or matter shall reveal and furnish "relevant unclassified material, documents, or information . . .as

such attorney shall deem necessary or desirable to the discharge of the attorney's official duties"

but that the "attorney shall consider, with respect to any disclosure, the factors set forth in

§ 16.26(a) of this part: And further provided, An attorney shall not reveal or furnish any material,

documents, testimony or information when, in the attorney's judgment, any of the factors specified

in § 16.26(b) exists . . . ." 28 C.F.R. § 16.23(a).

Section 16.26(a) provides as follows:

> In deciding whether to make disclosures pursuant to a demand, Department officials and attorneys should consider:
> > (1) Whether such disclosure is appropriate under the rules of procedure governing the case or matter in which the demand arose, and
> > (2) Whether disclosure is appropriate under the relevant substantive law concerning privilege.

Section 16.26(b) provides in pertinent part as follows:

> Among the demands in response to which disclosure will not be made by any Department official are those demands with respect to which any of the following factors exist:
> > (1) Disclosure would violate a statute, such as the income tax laws, 26 U.S.C. 6103 and 7213, or a rule of procedure, such as the grand jury secrecy rule, F.R.Cr.P., Rule 6(e) . . .
> > (5) Disclosure would reveal investigatory records compiled for law enforcement purposes, and would interfere with enforcement proceedings or disclose investigative techniques and procedures the effectiveness of which would thereby be impaired . . . .

A government employee who, when relying on the *Touhy* regulations, refuses a court order

to produce documents and/or disclose information cannot be compelled to do so by a contempt

citation. *See United States ex rel. Touhy v. Ragen*, 340 U.S. 462, 467-70 (1951) (holding that DOJ

employee could not be held in contempt for refusing to comply with subpoena *duces tecum* when

following internal DOJ rules regarding disclosure of information in DOJ files); *Boron Oil Co. v.*

*Downie*, 873 F.2d 67, 69 (4th Cir. 1989) ("*Touhy* is part of an unbroken line of authority which

directly supports Downie's contention that a federal employee may not be compelled to obey a

subpoena contrary to his federal employer's instructions under valid agency regulations."); *Edwards v. United States Dep't of Justice*, 43 F.3d 312, 317 (7th Cir. 1994) ("*Touhy* is part of an unbroken chain of authority that supports the Department's contention that a federal employee cannot be compelled to obey a subpoena, even a federal subpoena, that acts against valid agency regulations."); *In re Boeh*, 25 F.3d at 766 ("We conclude that, in the absence of a direct challenge to the Attorney General's decision to withhold permission and a ruling that permission was improperly withheld, Boeh cannot be held in contempt for refusing to testify without permission, pursuant to 28 C.F.R. § 16.22(a).") (footnote omitted); *Massock v. Superior Court*, No. C99-3713 SC, 2000 WL 10240, at *3 (N.D. Cal. Jan. 4, 2000) ("In the landmark case *United States ex. rel. Touhy v. Ragen*, 340 U.S. 462, 469 (1951), the Supreme Court held that a subordinate federal officer could not be held in contempt for refusing to obey a subpoena when such refusal was in accordance with valid federal regulations governing the release of official documents.").

As one federal court has explained:

> Under what is known as the "*Touhy* doctrine," not only is a court prohibited from holding a federal officer in contempt for non-compliance with a subpoena when following a regulation to the contrary but a court cannot even investigate the appropriateness of the federal officer's reliance on the regulation in question. The Ninth Circuit has explained that, "the *Touhy* doctrine is jurisdictional and precludes a contempt action regardless of whether [the regulation relied upon] is ultimately determined to protect the requested testimony." Accordingly, if a federal officer is relying (correctly or incorrectly) upon a properly promulgated regulation as a defense for non-compliance with a subpoena then the court is powerless to hold that officer in contempt. Thus, under the *Touhy* doctrine a court simply does not have jurisdiction to hold a federal officer following a proper regulation in contempt and a consideration on the merits cannot play a part in the court's decision.

*Massock*, 2000 WL 10240, at *3 (citations omitted).

## 2.     Discussion

Although the government was not required to do so, in the September 12, 2017 letter response to the special master, it described in detail the DOJ *Touhy* regulations, the substantive

law that those regulations obligate DOJ employees to consider when responding to requests for internal documents and information, and how application of that substantive law to the facts in this case and the specifics requests in the special master's RFI compels the response to the special master.  The September 12, 2017 letter explained that the documents and information that the special master sought fell within, among other things, the prohibition on production and disclosure in 28 C.F.R. § 16.26(b)(5) of "investigatory records compiled for law enforcement purposes [the disclosure of which] would interfere with enforcement proceedings or disclose investigative techniques and procedures the effectiveness of which would thereby be impaired" and that much of the demanded documentation and information also was privileged, a fact that a DOJ attorney must consider under 28 C.F.R. § 16.26(a)(2) when deciding whether disclosure is "necessary or desirable to the discharge of the attorney's official duties."  28 C.F.R. § 16.23(a).  *See* Exhibit #1 at pp. 17-22.  In short, much of the government's response was dictated by the concern identified in the *Touhy* regulations about disclosure of law enforcement sensitive and privileged information.

Whether or not this Court agrees with the government's *Touhy* analysis, it would be legally erroneous for it to sanction government counsel, Special Attorney Clymer, through a contempt citation as the Federal Public Defender requests.  Special Attorney Clymer did not act in contempt of court; instead he complied with federal law.

Significantly, there has been no challenge from the special master, any party to this litigation, or the Federal Public Defender's Office to any factual or legal aspect of the government's letter response to the special master: not its description of the *Touhy* regulations and relevant decisional law regarding those regulations; not its discussion of the substantive law that the *Touhy* regulations require that DOJ employees consider; not its extensive discussion of the facts showing that there is no evidence of any violations of the Sixth Amendment right to counsel

and attorney-client privilege; and not its conclusions when applying the *Touhy* regulations to special master's requests in light of the governing law and facts.[13]

Remarkably, the Federal Public Defender's Office, which asks this Court to issue an order to show cause based on the government's response to the special master, intentionally avoids discussing the substance of the very response that it claims is contemptuous. [#301 at p. 3, n.11]. Instead, it unhelpfully misconstrues the government's *Touhy* analysis as "objections," *id.* at p. 3 (mistakenly referring to "scatter-shot objections"), *id.* at n.11 (referring to "these objections"), *id.* at p. 4 (same), and inaccurately characterizes inapposite decisions concerning waiver.[14] In fact, the government's response to the special master's RFI did not "object" to anything; rather, it explained the *Touhy* regulations and how they apply in this context.

In short, the government's letter response to the special master resulted from Special Attorney Clymer's compliance with valid federal regulations that have the force of law. Indeed, the special master's October 20, 2017 Report acknowledges "that the OUSA *may* have valid bases upon which to refuse production of information." #298 at 8 (emphasis in original). Thus, it is

---

[13] Because the special master's recent report [#298] includes the September 12, 2017 letter response as Exhibit I, the response is available to all of the parties in this case, as well as to the Federal Public Defender's Office.

[14] The Federal Public Defender's Office cites *United States v. Ary*, 518 F.3d 775 (10th Cir. 2008), in support of an irrelevant and mistaken claim that the government "waived" its "objections." #301 at p. 3, n.13 & p. 4, n.14. *Ary* involved documents in a box seized pursuant to a search warrant that were in possession of the government. The Tenth Circuit made clear that its decision in that case involved whether delay in an assertion of the attorney-client privilege and work product doctrine would result in a waiver with respect to *involuntarily disclosed material*. *Id.* at 783. The Federal Public Defender's Office does not explain how *Ary* applies here, where there has been no involuntary disclosure. The other decision the Federal Public Defender's Office cites for support, *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643 (10th Cir. 2006), involved a finding of waiver following a *voluntary production* of a letter containing purportedly privileged information. *Id.* at 668. Because there was no voluntary or involuntary production here, neither decision does the Federal Public Defender's Office any good.

hardly surprising that the special master, in whom this Court has vested the power to recommend a contempt citation, *see* Appointment Order, Docket #146, at p. 13, has chosen not to do so.

There was no contempt of this Court and no defendant who has standing in this case has suggested, much less established that there was. The Federal Public Defender's Office, which has no standing and ignores what actually occurred, asks this Court to commit legal error. It should not do so.

## IV

## Conclusion

For the reasons stated above, the Federal Public Defender's "Motion to Show Cause" should be denied.

**Certificate of Service**

I hereby certify that on the 22nd day of December, 2017, the foregoing was electronically filed with the clerk of the court for the District of Kansas using the CM/ECF system, which will send a notice of electronic filing to all counsel.

*S/Deanna Lieberman*
Deanna Lieberman
Paralegal Specialist
United States Attorney's Office
Northern District of New York
